STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. DANIEL C. KREMENS, DEFENDANT-APPELLANT.

Argued May 21, 1968—Decided July 5, 1968.

*Mr. Martin J. Queenan,* Prosecutor of Burlington County, argued the cause for the respondent (*Mr. Myron H. Gottlieb* on the brief).

*Mr. Francis J. Hartman* argued the cause for appellant.

The opinion of the court was delivered by

HANEMAN, J. Defendant, a Caucasian, was convicted of the first degree murder of State Trooper Anthony Lukis and sentenced to death. He appeals under *R. R.* 1:2–1(*c*). At trial, defendant produced no witnesses, relying on his assertion that the State had failed to produce sufficient evidence upon which a guilty verdict could be based. In addition to the brief filed by defendant's court appointed counsel,

defendant filed a supplemental *pro se* brief. These combined briefs advance the arguments, *inter alia,* that (1) there was insufficient evidence to warrant a guilty verdict, (2) the admission into evidence of two confessions was improper, and (3) the alleged refusal of trial counsel to permit defendant to testify in connection with the proffer of the statements and the refusal of his counsel to interrogate and call a certain witness constitute reversible error.

The State's evidence, which as noted was not disputed and which is as follows, indicates that Trooper Anthony Lukis who was assigned to the New Jersey Turnpike reported to the Moorestown Station shortly before midnight May 4, 1966. Some time thereafter he left the station to begin a routine patrol of a designated section of the Turnpike. At 1:15 A.M. he reported his position as two miles north of Exit 4.

Preston Thomas, an assistant section chief who was traveling north in order to collect money from the various toll booths, left the booth at Exit 5 at about 1:30 A.M. As he entered the Turnpike he noticed a police car put on its dome light and begin to pull up to a "tan or beige Mustang" which was stopped at the side of the road near milepost 45 north, some 1,000 feet from the entrance ramp. Thomas observed one individual in the Mustang but, noticing nothing wrong, continued northwardly.

At approximately the same time Alfred Niedermaier, a truck driver traveling south, approached milepost 45. He saw a police car stopped behind another car. As they were on the other side of the Turnpike he paid no more attention until he drew closer. At this point he saw two men engaged in a struggle. He proceeded to the toll booth at Exit 5 where he reported the incident and heard the collector call for help. As a result of this call the State Troopers' Barracks attempted to contact Lukis' car and, receiving no answer, dispatched another car to the scene.

At the same time Niedermaier was reporting, Raymond Pitts, driving his truck north, approached the two cars. He

noticed "a trooper tussling with some guy" and what appeared to be a third figure standing at the rear of the trooper's car. He stopped his truck and ran back to help the trooper but was in time only to hear shots and see a Caucasian jump into a red Mustang and drive off. He then flagged down William Truitt, another truck driver, who used Lukis' radio to report an emergency, request an ambulance and warn that a red Mustang might be involved. The Turnpike radio control immediately broadcast this warning and just as it came over the radio, two Negro occupants of a maroon Mustang paid the toll at Exit 5 and left. Another vehicle's driver, a Caucasian, reported a lost ticket, filled out a form (signing his name as John Park) and drove off. (In his confession, defendant admitted he had used the name "John Parker" in exiting from the Turnpike).

Meanwhile Troopers Trauger and Bernhardt arrived at the scene where they found a New York driver's license bearing the name of the defendant on the seat of the trooper's car and a wallet belonging to Al Antino of Brooklyn in the grass to the rear of the car. It later developed that Antino's car in which he had left his wallet, had been stolen and later recovered without the wallet.

By 2:00 A.M. the State Police had put into operation a plan called the Delaware Valley Search Plan. In accordance with this plan Troopers Dory Saul and Barry Townsend took up positions on Route 30 near Paulsboro. At 3:20 A.M. a bronze Mustang drove past and the troopers gave chase in their cars. The chase continued for some five or ten minutes when the driver of the Mustang, identified by Townsend as a white male about six feet tall and weighing 185 lbs., abandoned the car and fled. Townsend examined the car and found a box of .32 caliber shells, a Turnpike ticket, and a lease contract for the car.

By this time a large concentration of police was in the area. Sergeant Gilcrest of the Woodbury Police heard someone in a wooded area nearby, pursued him and was able to hear him enter a body of water. He saw him emerge from

the far side of a stream and when the man refused to stop, Gilcrest fired a shot but missed.

Trooper Turse noticed some wet footprints at the creek and followed them to a house where he was joined by Detective Andrews and Deputy Chief Pulio of West Deptford. They saw the defendant crouched under a porch step and, when he refused to emerge, removed the step and pulled him out, ripping his outer clothing in the process. The defendant possessed two loaded hand guns which were taken from him. One of these guns was later shown by ballistic tests to be the murder weapon.

The arrest took place at approximately 5:20 A.M., and several minutes later defendant, in custody of the police, arrived by car at the Paulsboro Police Station. During the ride defendant was asked only for his name, which he gave. Kremens was "soaking wet", cold and shivering but he appeared calm and unemotional. Because he was wet, his shirt, T-shirt and jacket were removed and he was given a warm jacket and some coffee. Andrews testified that, in the presence of three or four other officers,

"I told him that he had the right to remain silent, anything that he said could be used against him, he had the right to have an attorney, the attorney could be present at any time he was questioned and if he didn't have the money to obtain the attorney the Court would furnish him one."

Immediately thereafter defendant said "I'll tell you". He then related a story of having fallen asleep on the Turnpike and being awakened by Lukis who noticed a bag which he thought contained a bottle of whiskey. Further investigation showed it to be a .25 caliber revolver and ammunition. Another bag was found which contained .32 caliber ammunition. Kremens was directed by the trooper to enter the State car. Defendant surreptitiously took a second loaded revolver — a .32 caliber revolver — with him to Lukis' car. When Lukis threatened to handcuff him and attempted to call in to headquarters Kremens grabbed his arm, a strug-

gle ensued, the gun went off and the officer fell. (Medical testimony indicated that six bullets were fired into Lukis' body at least three of which were fired from a distance of three to four inches.) Kremens started his car, crossed the Turnpike divider and drove back in a southerly direction. He exited from the Turnpike, filling out a lost ticket form, presumably because the ticket he had would show that he had been driving north. This statement was not reduced to writing.

After giving this story to the police defendant was taken to the Mantua State Police Barracks. He arrived at 5:50 A.M. where he was given coffee and cigarettes. He refused an offer of food. At 7:00 A.M. he was questioned again. Before the questioning he was told

"* * * that he had a right to talk with a lawyer of his own choice or anyone else before saying anything, and if he cannot pay for a lawyer, a Court will get one for him, also that anything that he does say can be held against him and used in court. And no threats of reward have been made."

He was then asked "Are you willing to give this statement" and he replied "I will tell you what happened". He then repeated substantially what he had said at Paulsboro, with minor differences, adding that he had filled out a lost ticket form in the name of "John Parker". This statement was reduced to writing but was not signed. Defendant proffered no proof on either the confession *voir dire* or the main case. The jury returned a verdict of guilty.

We will treat of defendant's asserted grounds for reversal in the order as above enumerated.

I

■ There was adequate evidence to sustain the verdict. *R. R.* 1:5–1; *State v. Balles,* 47 *N. J.* 331, 337 (1966) *certiorari* denied, appeal dismissed 388 *U. S.* 461, 87 *S. Ct.* 2120, 18 *L. Ed. 2d* 1321 (1966).

## II

Defendant also urges that the conviction must be reversed because the admission of the confessions was contrary to the decision in *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966) decided after the events detailed here but applicable nonetheless because defendant's trial began subsequent to that decision. *Johnson v. State of New Jersey,* 384 *U. S.* 719, 86 *S. Ct.* 1772, 16 *L. Ed.* 2d 882 (1966).

Defendant's argument that the court erred in the admission of testimony of the content of the oral confessions is two pronged.

Defendant says first, that the totality of the circumstances immediately preceding and during his interrogation negates the conclusion that the statements were voluntary. See *State v. Puchalski,* 45 *N. J.* 97, 101 (1965). Contrariwise, he asserts that his physical and mental condition, resulting from the vigorous and intensive "hot" pursuit and his fear of the police were "coercive circumstances" which convinced defendant that for his own safety he must give a statement, and claims that he was wet and cold as well as emotionally exhausted from the preceding chase and capture and that these factors preclude, as a matter of law, the possibility of a voluntary confession. We disagree. The facts show that defendant was given a warm jacket, coffee, cigarettes and was offered food. The effect of other factors such as the size of the room in which the statement was given and the number of officers present necessarily had to be determined by the trier of fact in assaying the voluntariness of the confession. *State v. Puchalski, supra.* On this point the trial judge found as a fact that the police did everything possible to make the defendant comfortable and that the confession was freely and intelligently made. We have independently examined the testimony concerning the pursuit and questioning of defendant including the setting of the latter and the persons then present, which stands undenied

and uncontradicted, and agree with the trial court's finding that the confessions were voluntary.

■ Second: He argues that, without denying that the warnings were given by the police as above quoted, the proffer of counsel could reasonably have been construed as being prospective instead of immediate. We find no factual support in the record for this argument.

■ Additionally defendant argues that there was no intelligent waiver of his constitutional right. *Miranda v. State of Arizona, supra,* requires that before a person is questioned he

"must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed". (384 *U. S.*, at *p.* 444, 86 *S. Ct.*, at *p.* 1612)

■ The trial judge made a preliminary finding from all the circumstances that the statement was voluntarily given and that the warnings of defendant's rights had been adequately given to effectively convey the meaning of defendant's basic rights. This is a sufficient compliance with the warnings in *Miranda, supra,* 384 *U. S.*, at *p.* 473, 86 *S. Ct.* 1602. The trial court also found that defendant indicated by his words and conduct that he intelligently and knowingly waived the exercise of the rights of which he had been advised when he insisted, after the police warning, that he desired to talk. We agree with the trial court that the warnings here given comport with the basic ideology of *Miranda* and that the circumstances indicate a waiver intelligently made. Defendant does not on this appeal challenge the first of the above conclusions. It is the second that defendant contests on two approaches.

He says first, that the words "I'll tell you" or "I will tell you what happened" are not legally sufficient to constitute a waiver. Defendant relies on the language of *Miranda, supra,* 384 *U. S.*, at *p.* 475, 86 *S. Ct.*, at *p.* 1628, which states

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."

for the conclusion that: "The essence of the waiver of the right to the assistance of counsel in an incustody [sic] police interrogation is threefold, it must include an understanding of the right which is offered, an intelligent evaluation of the situation and a voluntary intention on the part of the subject of the interrogation to forego the assistance of counsel".

■ But, of course, that is not the only way an individual may indicate his desire to waive his rights. On defendant's argument it would be necessary for the police to obtain a formalized recitation by an individual to the effect that "I do not wish to exercise my right to remain silent; I do not wish to exercise my right to an attorney" and so on. This is patently absurd. Any clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances. *State v. McKnight,* 52 *N. J.* 35 (1968); *State v. Yough,* 49 *N. J.* 587, 596 (1967); *United States v. Vanterpool,* 394 *F. 2d* 697 (2 *Cir. April* 29, 1968); *Keegan v. United States,* 385 *F. 2d* 260 (9 *Cir.* 1967); *Brisbon v. State, Fla. App.,* 201 *So. 2d* 832 (*Dist. Ct.* 1967). From an examination of the record we are in agreement with the trial court's conclusion that there was an intelligent and voluntary waiver.

### III

■ As was noted, the defendant did not take the stand nor was any other evidence adduced in his behalf either on the *voir dire* or the main case. In his *pro se* brief, defendant alleges difficulties with counsel and the refusal of counsel

to allow him to take the stand to testify as to the circumstances under which the confessions were given. Defendant now alleges brutality and although this was denied by the testifying officers we deem it wise to remand to the trial court for the purpose of taking testimony and determining why defendant did not testify and whether the failure to testify was with his consent. The court on such remand shall also take testimony of the defendant as to what he would have testified had he been placed on the stand and return that record to us without factual findings. Defendant also objects to the failure of his counsel to utilize a witness who would have allegedly contradicted other testimony as to the purchase of the murder weapon. While the crime charged was the use of the gun, not its purchase, if defendant did not buy the gun as he indicated in his confession, the contradiction might have cast doubt on the truthfulness of the confession. Testimony may be taken on that contention of defendant as well and returned to this Court. Jurisdiction will be retained in this matter to allow prompt disposition. Upon the return of the remand defendant may if he desires discuss before this Court the problems raised by the Supreme Court decisions in *United States v. Jackson, 390 U. S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d* 138 (1968) and *Witherspoon v. State of Illinois, 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d* 776 (1968).

We have examined the other contentions advanced by defendant and find no basis on which to reverse the conviction.

Affirmed and remanded for the above purposes.

*For affirmance and remandment*—Chief Justice WEIN-TRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.