(No. 42997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EUGENE JOHNSON, Appellant.

*Opinion filed September 25, 1973.*

JAMES J. DOHERTY, Public Defender, of Chicago (MICHAEL WEININGER and LEE T. HETTINGER, Assistant Public Defenders, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and BERNARD CAREY, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and KENNETH L. GILLIS and THOMAS A. MAUET, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

The defendant, Eugene Johnson, was found guilty by a jury in the circuit court of Cook County of the murder of Emma Pietras and the armed robbery of Otto Pietras, her husband, Joseph Schultz and Francisco Diaz during a robbery in Otto's Tavern in Chicago. Following the jury's recommendation, the trial court sentenced the defendant to death for the murder of Mrs. Pietras. The judge imposed three concurrent sentences of 50 to 100 years on the armed-robbery convictions. The defendant's appeal has been taken directly to this court.

The defendant's contentions on appeal are:

1. That he was not guilty of murder under the felony-murder doctrine.

2. That he did not knowingly waive his constitutional rights.

3. That the trial judge applied an improper standard in denying the defendant's motion to suppress the confession.

4. That the trial court erred in denying the defendant's motion to suppress identification testimony.

5. That the defendant was denied his right to counsel.

6. That the imposition of the death sentence was improper and the sentences for robbery were excessive.

Otto's Tavern was owned and operated by Otto Pietras and his wife, Emma Pietras. On April 18, 1968, at about 10:45 P.M., Otto Pietras, Frank Diaz, George Schehl, Joseph Schultz, Raymond Becker and Jerry Miller were seated at the bar and Emma Pietras was serving as the bartender. Two young men entered the tavern and going directly to the pool table at the rear of the premises they began to play a game but then abruptly left the tavern. Minutes later two others, armed with shotguns, entered. One of them, whose face was covered by a stocking mask, came through the front entrance and stationed himself at that door. The other, whose face was exposed, came

through the rear entrance and announced a holdup. That robber, who was later identified as the defendant, shoved his shotgun into Joseph Schultz's stomach and told him to sit down. Schultz, who had been coming out of the washroom when he encountered the defendant, testified at trial: "I observed his face *** for a minute and just looked at him stone cold." The man then moved from one customer to another taking money and stuffing it into his pockets. He then went behind the bar and took the money from the cash register. The commission of the robberies took about five minutes. The robber who had taken the money then walked to his companion and both robbers walked out the front door. The man with the mask re-entered the tavern approximately two seconds later, it was testified, and fatally wounded Emma Pietras, who was sitting at the end of the bar and close to the front door.

The police learned that one Charles Knox had information about the crimes. He was picked up early on April 21 and was taken to the police station for questioning. There he stated that he had met Moses and Edward Clay at about 1:00 A.M. on April 19. They told him that they had committed a robbery and shot a woman at 1875 Bissell Street. He also said they had a large sum of money. The police then went to the apartment where the Clays lived, and arrested three brothers, Oscar, Moses and Edward Clay. One of the officers seized a wallet and watch which were in plain view in the living room and which had been taken in the robbery from Diaz.

Moses Clay, when questioned, told the police that the defendant had participated in the robbery. The officers proceeded to the defendant's home at 750 North Milwaukee Avenue and placed him under arrest. He was advised of his right not to make a statement and his related rights, and was taken to the police station. There he was again orally advised of these rights and was also given a card to read, on which these rights were printed. Following this the defendant made an oral statement that he had

robbed the patrons of Otto's and had taken the money from the register. He said that Edward Clay had shot Emma Pietras.

Shortly thereafter, two lineups were held in which Moses, Oscar and Edward Clay, Charles Knox, the defendant, and defendant's half brother, Louis Clayton, appeared. Four of the victims, George Schehl, Joseph Schultz, Frank Diaz and Ray Becker, viewed the first lineup. Schultz and Schehl, in the presence of Diaz and Becker, identified the defendant as one of the robbers. A second lineup was held shortly thereafter for Otto Pietras. He too identified the defendant.

After further questioning Moses Clay, the police then returned to the Clays' apartment building. They recovered a single-barrell .12-gauge shotgun from the rear roof of the building and also a brown paper bag containing various identification cards bearing the name "Pietras" from a garbage can behind the building. The officers went to the home of the father of the Clays, who turned over a .16-gauge shotgun to the police. At trial there was testimony that the shotguns looked like the shotguns carried by the robbers.

Motions by the defendant to suppress physical evidence, statements and identifications were heard and denied prior to trial.

At trial, Schehl, Pietras and Diaz identified the defendant as the man who had robbed them, and Diaz also identified a wallet, watch and other personal items recovered as having been taken from him in the robbery by the defendant. Schultz identified the defendant as the robber who had thrust the shotgun at his stomach and also identified various recovered identification cards as having been taken from him in the robbery.

The prosecution also put on as a witness Officer James Shannon, who testified that the defendant had admitted to him that he had participated in the robbery but had denied shooting Mrs. Pietras. The testimony of Officer Frank

Blash corroborated Officer Shannon's testimony. Joseph Mortimer, a fingerprint technician of the Chicago Police Department, identified latent fingerprints found on contents of the paper bag recovered from the garbage can behind the Clay building as being those of the defendant.

An aunt of the defendant, Catherine Maiden, and the defendant testified that he had been asleep on a couch at Mrs. Maiden's home at 747 North May Street between 7:00 P.M. and 12:00 P.M. on the night of the crimes. His half brother, Louis Clayton, testified he had seen the defendant asleep on a couch at his aunt's home at 10:00 P.M. on that night. The defendant also denied that he had made any oral statement to Officer Shannon.

The defendant's first contention is that the evidence did not establish his guilt under the felony-murder doctrine, because it showed that the killing occurred after the robbery had been completed. He argues that when the door closed behind Edward Clay, who, it appears, was later convicted in a separate trial of the murder of Emma Pietras, the felony was ended and any act committed by Clay after that time was not related to the robbery.

The argument is not well founded. The doctrine of felony-murder is part of our law. Section 9—1 of the Criminal Code provides, in part: "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death: *** (3) he is attempting or committing a forcible felony other than voluntary manslaughter." (Ill. Rev. Stat. 1967, ch. 38, par. 9—1(a)(3).) And of course one who aids or abets the planning or commission of a crime is legally accountable for the conduct of the principal. (Ill. Rev. Stat. 1967, ch. 38, par. 5—2.) Thus, "Where murder is committed during a robbery, all participants in the robbery are deemed equally guilty of murder and it is immaterial who fired the fatal shot. [Citations.] " (*People v. Weber, 401 Ill. 584, 604;* see also *People v. Armstrong, 41 Ill.2d 390; People v. Golson, 32 Ill.2d 398; People v. Bongiorno, 358 Ill. 171.*) The

defendant need not to have been actually present at the killing to be guilty under the felony-murder doctrine. (*People v. Brown, 26 Ill.2d 308.*) If the killing is in the course of escape it is within the operation of the doctrine. (*People v. Bongiorno, 358 Ill. 171.*) In *Bongiorno,* two men, Bongiorno and King, committed an armed robbery, which was interrupted by a police officer. King escaped through a window, but Bongiorno was arrested by the officer. As Bongiorno was being taken down a hallway, King, who had returned, shot and fatally wounded the officer in the back. Bongiorno's contention was that he was not guilty of murder under the felony-murder doctrine because five minutes had elapsed after the robbery had been completed and the prosecution's evidence did not show any plan or design to kill in the course of the robbery. In affirming the conviction this court said, "Here the uncontradicted evidence shows that the conspirators designed to commit the crime of robbery through the use of a deadly weapon. That use included the intimidation of the victims and the means of the offenders' escape. Under such circumstances the intention to kill, if necessary, in obtaining and carrying away the loot is established. A plan to commit robbery would be futile if it did not compre- hend an escape with the proceeds of the crime. *** Unless the plan of robbery is to terrify the victim, and, if occasion requires, to kill any person attempting to apprehend them at the time of or immediately upon gaining possession of the property, it would be inane and childlike. *** It is vain to argue that the killing was not included as a part, if necessary, in the commission of the crime which both Bongiorno and King had deliberately planned." 358 Ill. at 173-4.

We observed in *People v. Golson, 32 Ill.2d 398, 408,* that it was held in *Bongiorno* that if a killing is committed in the course of an escape from a robbery "*** each of the conspirators is guilty of murder, for the crime had not been completed at the time inasmuch as the conspirators

had not won their way to a place of safety."

In *Golson* the defendants argued that the felony-murder doctrine could not be applied as their conspiracy had been to steal from the United States mails, a nonforcible felony. We rejected the contention, saying, "In our opinion the test to be applied in determining whether the felony-murder doctrine is applicable is not whether the felony is normally classified as non-violent, but is whether, under the facts of a particular case, it is contemplated that violence might be necessary to enable the conspirators to carry out their common purpose. *People v. Brown, 26 Ill.2d 308.*" 32 Ill.2d at 407.

Edward Clay lived only 500 yards from Otto's Tavern. It appears he feared being identified during the robbery. Defendant said Clay told him he was going to put a stocking over his head because "the old lady may know me." Throughout the robbery Clay stood at the door, six feet away from Mrs. Pietras. Why he returned two seconds after leaving the tavern to kill the woman cannot be certainly determined, but the jury could have concluded that it was because he sensed she had recognized him. By killing her he would improve the defendant's and his chances for escape, would avoid detection for the crimes, and would eliminate the possibility of Mrs. Pietras testifying against him.

The defendant and Clay carried shotguns into the tavern. Obviously the weapons were to be used if necessary for commission of the robberies. Obviously, too, the plan for the crimes would include the use of the weapons if necessary to avoid apprehension and to effect an escape. Mrs. Pietras was shot in the presence of the other robbery victims and on the premises where the robberies took place. When Clay killed her the robbers had not "won their way to a place of safety." (*People v. Bongiorno, 358 Ill. 171; People v. Golson, 32 Ill.2d 398.*) The defendant was chargeable with the murder of Mrs. Pietras.

The defendant's second contention is that while

admittedly he was adequately advised of his pertinent rights prior to the confession that it was testified he gave, he did not knowingly and intelligently waive those rights.

To support this contention he cites the indisputably correct observation made in *Miranda v. Arizona, 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602,* that "a valid waiver will not be presumed \*\*\* simply from the fact that a confession was in fact eventually obtained."

At the hearing on the defendant's motion to suppress the oral statement, three police officers and the defendant testified as to the circumstances of the giving of the statement. Two officers, Frank Blasch and Joseph Mucia, testified that the defendant was informed of his pertinent constitutional rights after his arrest. Officer Mucia said that the defendant remained silent and did not respond. Officer Shannon testified that he orally advised the defendant of his rights at the police station and gave the defendant a card on which these constitutional rights were printed. The witness testified that the defendant examined the card between two and four minutes and when he then asked the defendant "Is there anything to say?" the defendant replied, "I didn't kill her." Thereafter Shannon said the defendant made the oral statement admitting the robbery. Officer Blasch testified in corroboration of Officer Shannon's testimony.

The defendant testified that he did not remember being informed of his rights when he was arrested in his apartment but he did remember Officer Shannon informing him of his constitutional rights. He further testified, however, that he did not understand what his rights were. Too, he denied having made an oral statement to Officer Shannon and denied having received any card bearing his rights.

The question whether the defendant has been properly informed of his rights and whether he knowingly waived those rights was for the trial court. In making its determination the court need not be convinced beyond a

reasonable doubt, and its finding will not be disturbed unless it was against the manifest weight of the evidence. *Lego v. Twomey, 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619; People v. Dailey, 51 Ill.2d 239, 242.*

In *People v. Brooks, 51 Ill.2d 156, 164,* we observed: "An express waiver of the right to counsel is not necessary. The test is that there be a showing of a knowing intent to speak without counsel. Once the defendant has been informed of his rights and indicates that he understands those rights it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them. *(People v. Johnson (1969), 70 Cal. 2d 541, 450 P.2d 865, 876, 75 Cal. Rptr. 401; People v. Higgins (1971), 50 Ill.2d 221.)*" A similar expression by this court in *People v. Higgins, 50 Ill.2d 221, 227,* was: "An express, formalistic waiver is unnecessary for '[a]ny clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances.' *(State v. Kremens, 52 N.J. 303, 245 A.2d 313, 317.)*" Here the defendant, according to Officer Mucia, was advised of his rights upon his arrest. Later at the police station Officer Shannon advised him of his rights and he was given the card with the printed rights and asked to read it. He was also asked: "Do you know and can you read the English language?" He said, "I can." After looking at the card between two and four minutes he gave a voluntary statement.

We judge that the trial court's finding that there was an understanding waiver of rights by the defendant was not contrary to the manifest weight of the evidence.

Related to the preceding contention is the defendant's complaint that the trial court improperly considered that the defense had to establish "that there was no intelligent and knowing waiver." He says the following remarks by

the trial court illustrate this: "I heard nothing yesterday that would indicate to this Court that there was no intelligent and knowing waiver. The only testimony that was presented by the defense in any way was the defense counsel inquired of Mr. Johnson if he was frightened at the time of his arrest and Mr. Johnson said, properly and truthfully, that he was." However, the isolation of these remarks from the court's full statement is misleading. The record clearly shows that the trial judge fully understood that the prosecution had the burden of proving the waiver and that he considered it had been satisfied. The quoted remarks were simply the trial judge's comment on the meagerness of the defendant's offsetting evidence.

Another claim of error, in which the defendant relies on *United States v. Wade, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926,* and *People v. Blumenshine, 42 Ill.2d 508,* is that the pretrial identification procedure which occurred at the police station was highly suggestive and tainted three of the occurrence witnesses' in-court identifications. The claim is founded on the fact that four victims of the robbery viewed a lineup together and one of them identified the defendant in front of the other three before those three had an opportunity, the argument is, to make an independent decision on identification. He claims that the testimony of these three witnesses at trial was the direct result of the suggestive identification procedure employed by the police.

The practice of permitting victims of a crime, when an identification is attempted, to view a lineup in the presence of each other has been criticized. (See *United States v. Wade, 388 U.S. 218; People v. Burbank, 53 Ill.2d 261.*) But here we need not make a determination whether the identification procedure was improperly suggestive. This is because even if it were so determined, the in-court identification by the witness nevertheless would be admissible if it were based on a source independent of and uninfluenced by the suggestive pretrial confrontation.

*People v. Fox, 48 Ill.2d 239; People v. Blumenshine, 42 Ill.2d 508.*

Here there were four witnesses in addition to Pietras who viewed the defendant for approximately five minutes during the robbery. The defendant challenges the testimony of three of them as having been tainted. The defendant individually robbed each of these witnesses and walked around behind the bar in their view. The lighting in the tavern, provided by large fluorescent fixtures over the front entrance, over the pool table, and behind the bar, was excellent. We conclude that there was clear and convincing evidence that each of the three witnesses' identifications of the defendant had an origin independent of what, for purposes of this argument, we have assumed to have been a suggestive and improper lineup procedure. *People v. Blumenshine, 42 Ill.2d 508, 512, 515.*

The defendant's next complaint, that he had a right to counsel at the lineup which was not respected, is not meritorious. It is clear from *Kirby v. Illinois (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877,* that there is a right to counsel at a lineup only when adversary judicial proceedings have been initiated. There had not been proceedings begun against the defendant at the time of the lineup here.

The People correctly agree with the defendant's contention that the death sentence here under *Furman v. Georgia, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726,* cannot stand. We will vacate the sentence of death and remand to the trial court for a new hearing and resentencing on the murder conviction. *People v. Speck, 52 Ill.2d 285.*

The defendant says, too, that the three robbery sentences of 50 to 100 years are excessive, considering, *inter alia,* his age (17 years at the time of the crimes), his not having had any prior convictions and, according to his brief, the fact that Edward Clay, who, under the evidence, actually killed Emma Pietras, after a bench trial before

another judge, which followed the defendant's trial, was sentenced to a term of only 40 to 60 years.

In view of the fact that we are remanding to the trial court for resentencing on the murder conviction, we judge it appropriate to remand also as to the robbery sentences, so that the trial court may consider the convictions together in determining the question of penalty. We vacate the three robbery sentences to allow the imposition of different sentences should the trial court desire to do so.

For the reasons given, the judgment of conviction is affirmed and the cause is remanded to the circuit court of Cook County with directions to conduct a new hearing in aggravation and mitigation and resentence the defendant.

*Affirmed and remanded,
with directions.*