THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FREDDIE MARTIN, Defendant-Appellant.

First District (4th Division)    No. 77-1346

Opinion filed December 27, 1979.

Ralph Ruebner and Daniel Cummings, both of State Appellate Defender's Office, of Chicago, for appellant.

284

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Linda Dale Woloshin, and Joseph P. Quirk, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Freddie Martin, was convicted of burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1), armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), and the murders of Catherine and Herbert Alferink. He was sentenced to 150 to 450 years in the Illinois Department of Corrections for the murder of Catherine Alferink, 150 to 450 years for the murder of Herbert Alferink, 20 to 60 years for armed robbery, and 3 to 9 years for burglary, the sentences to run concurrently. We affirm.

The issues presented for review are (1) whether defendant's right to counsel was violated in consequence of his being interviewed outside the presence of his attorney; (2) whether the trial court erred in denying defendant's motion to quash a search warrant and in failing to disclose the identity of the informant upon whose statements the warrant was issued; (3) whether the evidence admitted at trial concerning other crimes and occurrences denied defendant his right to be tried only on matters with which he had been charged; (4) whether there was error in refusing to dismiss a juror for cause; (5) whether the trial judge erred in allowing the State to delay examination of physical evidence by the defense and contradicted its own discovery order; (6) whether the prosecuting attorneys' conduct was inflammatory and improperly aroused prejudice against the defendant; (7) whether the court erred in refusing to call a witness as a court's witness; (8) whether the court erred in admitting into evidence a policeman's field contact card; and (9) whether the State failed to prove the defendant's guilt beyond a reasonable doubt.

A warrant for the search of Freddie Martin and the premises of 8840 South May, Chicago, Illinois, was issued on January 18, 1976. The complainant subscribing to the warrant was Officer Nick Graves of the Harvey, Illinois, Police Department. In his complaint, Officer Graves alleged he had been informed by a citizen that Freddie Martin was responsible for the murders of Herbert and Catherine Alferink 2 days earlier and of the murder of another unidentified man 3 weeks before that. Officer Graves was also advised that a land deed, made out to Herbert Alferink, and the wedding rings belonging to Mrs. Alferink were to be found at 8840 South May. The complaint for the warrant reads as follows:

"Your affiant Det. Nick Graves of the Harvey Police Department, Harvey, Illinois, has on 18 Jan. 76, engaged in a conversation with

an informant who stated to me that the person responsible for the murders of the two old people in Harvey, two days ago is a Freddie Martin, 8840 S. May, Chicago, Illinois, that hidden in the residence at 8840 S. May, Chicago, Illinois is a deed for land in Florida made out to a Herbert Alferink, also taken were wedding rings from Mrs. Alferink. Informant also stated that Freddie Martin had also killed an old white man down the street from his residence and taken a large coin collection, about three weeks ago. Informant stated he was afraid for his life as Freddie Martin told him if you tell anyone, I'll kill you too. Affiant Det. Nick Graves acting on this information contacted Inv. Long, Chicago Police Department and ascertained that in the area of 8840 S. May, Chicago, Illinois, on Dec. 1, 1975 an elderly white man had been killed and a large coin collection taken. Also that Freddie Martin has a police record dating back to 1966, with convictions for burglary and armed robbery with sentence to Joliet Prison, Last sentence being 3 May, 1971, 5-10 years for armed robbery. Affiant Det. Nick Graves then ascertained thru interviewing Agnes Golec, daughter of victims, Herbert and Catherine Alferink that missing from victims was a set of wedding rings, white gold and a land deed in the name of Herbert and Catherine Alferink for land in Florida."

Freddie Martin was arrested on January 16, 1976, by Chicago police officers for offenses not related to this case. On January 19, 1976, he was interviewed at the Criminal Courts Building in Chicago by Officer Thomas Morrison of the Harvey Police Department. Prior to going to the Criminal Courts Building, Officer Morrison had called Assistant State's Attorney Louis Leone and told him of his plan to interview Martin. Leone said he called the public defender's office and asked whether Martin had been assigned an attorney and was told that one had not been assigned.

After ascertaining that defendant did not have a private attorney, and after the public defender's office seemed to refuse appointment of an attorney to Martin, Leone said he and Morrison went ahead with the interview. Martin was read his *Miranda* rights; he stated he understood those rights, but wished to waive them, and proceeded to make a statement. Leone testified further that Martin stated he understood his rights and had nothing to hide. Leone also stated he heard Martin say he was in a hotel in Chicago with his wife on the night the crimes were committed.

At a hearing on the defense motion to suppress the statement, three assistant public defenders testified. None could remember granting permission to interview Martin and none admitted to refusing to

represent Martin. After arguments by both sides, the court denied the defense motion to suppress the statements made by Martin. The court noted that the *Miranda* warnings had been given properly.

On March 10, 1976, defendant Martin was charged with two counts of murder, two counts of armed robbery, two counts of burglary, two counts of aggravated battery, and one count of attempt murder. All counts referred to occurrences on January 15, 1976, involving the victims, Herbert and Catherine Alferink. Martin entered a plea of not guilty.

A motion by the defense to quash the search warrant and suppress evidence obtained as a result of the warrant was denied by the court on June 1, 1976. The defense also made a motion in limine to restrict the testimony of Martin's wife, Gwenda. Following a hearing on September 8, 1976, the trial court ruled Gwenda Martin could testify about acts of defendant, but not about conversations between husband and wife.

The trial court ruled each side would be given 10 peremptory challenges, and jury selection was commenced. Both sides exercised all of their challenges before voir dire was concluded. The defense asked that Elizabeth Reno be excused for cause after she said she thought her empathy for older people might affect her judgment. The trial court refused to excuse her since she indicated she would try to be fair. After the jury selection was completed, sequestration was ordered and evidence was presented.

Before trial, defense counsel requested to see the physical evidence the State intended to use at trial. The State indicated that evidence was available for examination at the Harvey Police Department. The defense objected to the use of "open file" discovery, but objection was overruled. The trial court assured the defense the physical evidence could be viewed before opening statements were made. The trial judge later ruled inspection would occur prior to introduction of individual items of physical evidence. On October 22, the defense again requested to see the physical evidence. The trial court then signed an order prepared by the defense which directed the State to produce all of the physical evidence for inspection immediately or lose the right to introduce it at trial. On October 25, defense counsel acknowledged they had seen four pieces of the State's physical evidence.

The first witness testifying on behalf of the People was Ruth Bronson, the daughter of the Alferinks. Ms. Bronson testified as to the condition of her parents and their home when she arrived there on the morning of January 16, 1976. Ms. Bronson had gone to her parents' home to take her mother shopping. She found the front door unlocked and the shades drawn. Upon entering the house, she noticed the television in the living room was on, both bedrooms had been ransacked, and there was a strong

smell of gas. Ms. Bronson found the bodies of her parents on the kitchen floor. Herbert Alferink was lying face down, while Catherine Alferink was lying on her back with a knife stuck in her chest.

Ruth Bronson further explained that the Alferinks regularly received monthly Social Security checks, and Herbert Alferink's retirement check. The Alferinks kept money and important papers in a locked tackle box. Ms. Bronson was able to recall her parents owned a certificate, printed on blue-green parchment, issued by a Harvey bank. She also testified she had identified several items at the police station that had been missing from the house when she discovered her parents.

The State then called Harvey police officer William Arnett. He testified he was the first policeman to arrive at the Alferink house. He verified that Ruth Bronson was on the scene. There was a strong smell of gas inside the house. Arnett testified further that the house appeared to have been ransacked, and that suitcases and boxes were left open. He found the kitchen door locked and no sign of forcible entry. Several pieces of evidence, including photographs taken at the scene, were submitted to Officer Arnett for identification. He identified a fork found on the kitchen floor, the rope tied on both victims, and the knives removed from the chests of each of the bodies. No fingerprints were found on these items. No fingerprints were taken from other items in the house.

On cross-examination, Officer Arnett testified the kitchen area had been "contaminated" by the time he arrived; consequently he took no fingerprints.

The State next called Ronald Russell, a Cook County sheriff's police evidence technician. Officer Russell testified he examined the crime scene on January 16, 1976. He was assigned to inspect the interior and exterior of the house and to look for any physical evidence; he was to dust for and take fingerprints, and have necessary photographs taken. Officer Russell was unable to find any relevant fingerprints at the scene of the crime or any signs of forcible entry into the home.

The next witness for the State was Joseph Chaparols, a Cook County pathologist. He testified that on January 17, 1976, he performed autopsies on Herbert and Catherine Alferink. Catherine had been stabbed five times in the upper chest; she had abrasions on her lower and mid-chest and right thigh, plus hemorrhages in the areas of her ankles and right wrist. The cause of death was a stab wound which had severed the aorta and lung. Herbert Alferink had two stab wounds in his upper chest, one which penetrated the bone and one which cut the pulmonary artery and aorta. Stabbing was the cause of death.

Harold Hutchens, a dispatcher for the South Suburban Safeway Bus

Lines, testified for the State. He said buses ran, roundtrip, daily between Harvey and Chicago, between the hours of 4:15 a.m. and 8:45 p.m. The buses ran from 63rd and Halsted, Chicago, to 154th and Park, Harvey.

Also testifying for the State was reserve Harvey police officer James Murray. He stated he observed defendant in a gas station in Harvey on the evening of January 15, 1976. Officer Murray asserted he observed the clothes worn by defendant and saw a portable television set in defendant's possession. He engaged defendant in conversation. Officer Murray reported this encounter with defendant on a field contact card which he turned into his supervisor and which, ultimately, over defense objection, was admitted into evidence. The State showed Murray a portable television set which he identified as resembling the one he had seen in defendant's possession. Murray could not recall seeing blood stains on defendant's clothing.

The next witness, Charles Brooks, a Harvey cab driver, testified he picked up defendant at the gas station and observed the clothes he wore and the fact that he was in possession of a portable television set. He drove defendant first to 103rd and Wabash Avenue and finally to 89th and May Street in Chicago.

The next State witness was Assistant State's Attorney Louis Leone who testified that after informing defendant of his *Miranda* rights on January 19, 1976, defendant waived his rights. Defendant then stated that on January 15 and 16, 1976, he had been with his wife at a hotel in Chicago and had not been in Harvey on these dates.

The State then called Albert Beard. Beard testified as to defendant's visit with him on the night of January 16, 1976, and defendant's request of him to assist in cashing a $1000 savings bond issued by the First National Bank of Harvey. Mr. Beard testified that defendant left the certificate with him, and that he turned the certificate over to police officers when they came to his home.

Gwenda Martin, defendant's wife, was the next witness and testified about seeing Martin as he boarded the suburban bus at 63rd and Halsted Street on the afternoon of January 15, 1976; about next seeing him later that night when he gave her a set of wedding rings, a brooch and a pendant watch, and showed her $300 in cash and a $1000 savings certificate; and about accompanying defendant to Albert Beard's house where defendant attempted to obtain cash for the savings certificate. On cross-examination, Gwenda Martin testified she had experienced a desire to kill defendant. On redirect examination, she explained defendant had beaten her and this gave rise to her anger against him.

Officer Nick Graves of the Harvey Police Department was next to testify. Officer Graves testified about his participation in the recovery of the portable television set from 8840 South May Street, the apartment of

defendant's sister. He also related the recovery of the wedding rings, the pendant watch and the brooch from defendant's wife, and the recovery of the $1000 savings certificate from Albert Beard.

On cross-examination, Officer Graves asserted there were no signs of forcible entry at the scene of the crime. He also said he had worked with an anonymous informant while investigating the case.

Three daughters of the victims, Agnes Golec, Elsie Marie Ashley and Ruth Bronson, testified they went to the Harvey police station and identified the items recovered by Officer Graves from defendant's sister, his wife and Albert Beard. They identified those items as having been in the home of their parents.

The State's presentation included testimony elicited from Marie Johnson, Officer John Tully, William Scanlon, Mildred Knafkus, Jack Cohen, Dr. Robert Stein, Officer Ray Martin, Emma Hines and Gwenda Martin. These witnesses testified to events that occurred on or about November 12, 1975, relating to the death of Gus Strombeck and the loss of certain of his possessions. The State proceeded, by testimony of these witnesses, to explain the fatal stabbing of Gus Strombeck in which a kitchen knife was put to the chest of the victim. Certain property belonging to Mr. Strombeck was identified as coming from Gwenda Martin who had been given the property by her husband.

On October 28, 1976, the State rested its case. The defense requested the court to call Johnny Thomsen as a court's witness. Both the State and the defense refused to vouch for the credibility of Thomsen. The defense contended it was Thomsen who was the offender. The defense stated injustice would result if Thomsen were not called as a court's witness. The trial court refused to declare Johnny Thomsen a court's witness and the defense rested without calling any witnesses.

■■ The threshold argument of defendant is that when he was interviewed on January 19, 1976, without the presence of counsel, his rights were violated. The United States Supreme Court has held that the sixth amendment right to counsel does not attach until after the initiation of adversary judicial criminal proceedings. (*Kirby v. Illinois* (1972), 406 U.S. 682, 688, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881.) The Illinois Supreme Court specifically followed that rule in *People v. Burbank* (1972), 53 Ill. 2d 261, 271, 291 N.E.2d 161, 167. These two cases manifest that prior to vestment of a right to counsel there be a maturation of the adverse positions of government and defendant, signaled by some need to prepare a defendant for meeting his legal adversary.

■■ At the time of the interview under question, defendant Martin was in custody of the Chicago police. He had been arrested on January 16, 1976, and held for preliminary hearing on an unrelated charge. In the case at bar, defendant had not been charged either by indictment or information.

No initiation of an adversary judicial criminal proceeding had begun so as to raise a constitutional right to counsel.

Further, Assistant State's Attorney Leone and police officer Morrison twice advised defendant of his *Miranda* rights. Defendant twice acknowledged he understood those rights, and he waived them. At no time did he indicate a desire to have counsel present.

Defendant asserts the sixth amendment requires that in all criminal interrogations a suspect is entitled to be represented by counsel. To support this assertion, defendant cites *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The United States Supreme Court specifically required that a suspect be made aware of his right to the presence of his counsel during any interrogation. The court in *Miranda* also held that a defendant may waive his right to counsel or may remain silent, and that any statement made could then be admissible in a criminal proceeding, provided the waiver was made voluntarily, knowingly and intelligently. (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602.) The Illinois Supreme Court interpreted the *Miranda* decision, as it pertained to waiver, in *People v. Brooks* (1972), 51 Ill. 2d 156, 164, 281 N.E.2d 326, 332, and said:

> "The test is that there be a showing of a knowing intent to speak without counsel. Once the defendant has been informed of his rights and indicates that he understands those rights it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them."

The determination as to whether a defendant has been properly informed of his rights and whether he voluntarily, knowingly and intelligently waived those rights is to be made by the trial court, and that determination will not be disturbed unless it is against the manifest weight of the evidence. (*People v. Johnson* (1973), 55 Ill. 2d 62, 70-71, 302 N.E.2d 20, 25.) Here, the record is clear the *Miranda* warnings were read twice to defendant, he understood those warnings, and he did not request the presence of counsel. The evidence supporting this conclusion was not controverted at the hearing on the motion to suppress the statement or during trial.

We do not find it necessary to reach defendant's argument concerning *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199. There, the United States Supreme Court held that *post-indictment* statements obtained at a pretrial hearing are inadmissible if defense counsel is not present. Here, the interview of which defendant complains was held January 19, 1976, and it was not until March 10, 1976, that a charge was lodged against Martin by way of information.

Defendant next contends the court erred in denying his motion to

quash the January 18, 1976, search warrant and suppress the evidence obtained as a result of the search. Defendant argues not only were the statements of the informant insufficient to establish probable cause, but, also, the identity of the informant should have been disclosed to defendant.

In support of their arguments on the search warrant, both the defendant and the State cite *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, and *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584. In *Aguilar*, the court held:

> "[T]he magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed [citation] was 'credible' or his information 'reliable.' " (378 U.S. 108, 114, 12 L. Ed. 2d 723, 729, 84 S. Ct. 1509.)

*Spinelli* refined the *Aguilar* standards:

> "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause [citation]; that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial [citation]; that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense [citation]; and that their determination of probable cause should be paid great deference by reviewing courts [citation]." 393 U.S. 410, 419, 21 L. Ed. 2d 637, 645, 89 S. Ct. 584.

The Illinois Supreme Court adopted the *Aguilar* standards in *People v. Mitchell* (1970), 45 Ill. 2d 148, 153, 258 N.E.2d 345, 348. Accordingly, after review of the warrant in question, we find it was properly issued for probable cause and met the standards of *Aguilar* and *Spinelli*, as followed by *Mitchell*.

In attacking the determination made by the judge, defendant challenges the reliability of the informant. However, Officer Graves did not solely rely upon the statements made by the informant. He verified the statements so as to reenforce their reliability. Based on the information acquired to the effect that defendant had been convicted of a similar crime and had been sentenced to the penitentiary, the Chicago Police Department was contacted. It was discovered that Freddie Martin of the May Street address had been sentenced to the penitentiary and released approximately 6 months earlier. Also, Chicago police confirmed there had been the murder of an elderly man in the May Street area in a manner described by the informant. The informant had not only

identified Freddie Martin as being responsible for the Alferink homicides, but he also identified some of the items taken from the victims. Officer Graves went further in interviewing a daughter of the victims to verify that the items mentioned by the informant had, indeed, been missing from the Alferink residence. Reference to all of the data gathered by Officer Graves, as well as the officer's actions taken in verifying all facts, were set forth in the complaint for the search warrant.

Defendant urges that the identity of the anonymous informant, upon whose statements the warrant was based, should have been disclosed. We do not agree.

■■ It is proper for the court to balance the public interest against the constitutional right to prepare a defense. (*Roviaro v. United States* (1957), 353 U.S. 53, 62, 1 L. Ed. 2d 639, 646, 77 S. Ct. 623, 628-29; *People v. Lewis* (1974), 57 Ill. 2d 232, 234-35, 311 N.E.2d 685, 687.) The public has an interest in obtaining the information that citizens wishing to remain anonymous may provide, where such information reasonably may lead to the prosecution of criminal activity. On the other hand, defendant has a constitutionally protected right to confront his accusers and prepare a defense. If the court finds the constitutional rights of the defendant have been protected, then nondisclosure of an informant's identity is proper.

■■ This court in *People v. Jackson* (1976), 37 Ill. App. 3d 279, 284, 345 N.E.2d 509, 513, used the test set out by the United States Supreme Court and found that disclosure was not appropriate where there was no showing the informant was a witness or participant in the crime. A review of the record does not show that the informant's role in this case was other than to provide information which supported the issuance of a search warrant. This, coupled with the finding that the execution of the search warrant complained of resulted in obtaining only one of several pieces of physical evidence used to support the case against defendant, compels us to conclude that the defendant has not been deprived of his right to a defense. The defense had the opportunity to challenge the information contained in the search warrant, including the fruits of the resultant search.

■■ In completing the balancing test, we must consider the public's interest in encouraging citizen informants to provide information on criminal activity. Their protected anonymity is necessary to secure a flow of information. The informant who spoke to Officer Graves told him he feared Martin because Martin was known to be a violent person, with a criminal record, and had been accused of other murders. There was ample justification for protecting the anonymity of the informant. We, therefore, agree with the trial court's determination to uphold the search warrant, and the court's denial of the motion to disclose the identity of the informant.

The defendant challenges the evidence admitted at trial concerning another murder. Marie Johnson took the stand and told of her discovery of the murder of Gus Strombeck. She said she saw a man carrying a package under his arm outside her house on November 12, 1975. She identified that man as Freddie Martin. Shortly after seeing Martin, she noticed smoke coming from the house next door. It was then that she called the police and fire departments. Officer Tully testified to his arrival at the scene, the ransacked condition of the house, and the blood on the victim's chest.

William Scanlon, a Chicago police evidence technician, testified that Strombeck had been stabbed in the mid-chest. Mildred Knafkus, owner of Strombeck's house, said that Strombeck kept a coin collection that was found missing after the fire occurred. Two brooches belonging to Mildred Knafkus were also missing. Further testimony revealed that missing from Strombeck's house were $200 in cash, a cassette tape recorder and two gold watches. Pawnbroker Jack Cohen identified a pawn ticket made out on November 26, 1975, for a cassette recorder. The signature on the pawn ticket was later identified as that of Freddie Martin.

Pathologist Dr. Robert Stein testified that he performed an autopsy on Gus Strombeck. From his examination of the body, he determined the cause of death was a perforated heart resulting from five stab wounds to the chest.

Chicago police officer Roy Martin offered testimony that he spoke with defendant Martin at Cook County jail on January 23, 1976. Defendant Martin denied knowing where the Strombeck house was located and said he was in Little Company of Mary Hospital on November 12, 1975. Officer Martin also testified that the distance from the Strombeck house to 8840 South May was 4½ blocks.

Emma Hines, an employee of Little Company of Mary Hospital, testified that Martin was not a patient on November 12, 1975. She stated that she checked the records regarding Martin, and that his last contact with the hospital had been in October 1975.

Finally, Gwenda Martin, recalled by the State, testified she saw a cassette tape recorder, two watches, two brooches, two black purses, and some Indianhead and foreign coins in Martin's possession. She was given the two brooches by Martin. She also testified to going to two different pawn shops with the tape recorder.

Defendant accurately states the general rule that evidence of other crimes for which defendant is not on trial is inadmissible. (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) However, there are exceptions to the rule. Thus, such evidence is admissible where it goes to show common scheme or modus operandi. *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, 492-93.

The issue of admissibility turns on whether, in light of the applicable exception, the trial court abused its discretion in allowing that testimony. The Strombeck and Alferink murders appear to have a common scheme. The victims in both cases were elderly people who lived alone. Both killings occurred in the kitchens of the homes and were the result of stabbings with knives. In both cases the houses were ransacked and small valuables, such as jewelry, cash, and appliances, were taken. In both cases Freddie Martin gave certain of the taken items to his wife, and these items were identified as coming from the houses of the victims. Martin asserted that he was elsewhere when the crimes occurred, and his statements were shown to be false.

■■ ■ Defendant alternatively argues that even assuming the threshold admissibility, the evidence should not have been admitted because the probative value of the evidence was exceeded by its prejudicial effect. The test in such cases is whether, notwithstanding the admission of the objectionable evidence, the other evidence presented at trial proved defendant guilty beyond a reasonable doubt (*People v. Armstrong* (1961), 22 Ill. 2d 420, 176 N.E.2d 755), and the decision of the trial court will not be reversed unless it appears that "real justice" has been denied. (*People v. Crotty* (1976), 44 Ill. App. 3d 413, 419, 357 N.E.2d 1360, 1364.) We find sufficient evidence to support defendant's conviction wholly apart from any evidence linking him to the Strombeck killing. At the time the evidence of the Strombeck case was introduced, substantial evidence had been heard, and the State had established its case in chief. The additional testimony for the State acted further to eliminate doubt without undue prejudice to defendant. The similarity of the two cases is such that we do not find error in admitting evidence of the Strombeck murder.

The refusal of the trial court to disqualify juror Elizabeth Reno for cause is challenged by defendant. The law to be applied here is set out in *People v. Cole* (1973), 54 Ill. 2d 401, 414, 298 N.E.2d 705, 712. In *Cole,* the Illinois Supreme Court asserted that the determination of whether or not the prospective juror possesses the state of mind which will enable him to give to an accused a fair and impartial trial rests in the sound discretion of the trial judge. The trial court's determination should not be set aside unless it is against the manifest weight of the evidence. The court provided a gauge to measure impartiality by adding that statements of the juror are proper for the court to consider as evidence of his state of mind, although the juror need not be shown free from mere suspicion of bias or partiality. *Cole,* at 414-15.

■■ In the case at bar, juror Reno stated she had empathy for older people, but she did not feel empathy would affect her judgment. In response to defense counsel's questions, Reno responded she would try to

accept the judge's instruction to ignore "sympathy" [*sic*] and "prejudice" in reaching a verdict. She admitted there was a "good possibility" her empathy for older people would weigh in her ability to be fair. It would not be unusual, in our opinion and in the stated opinion of the trial court, for anyone to express empathy for elderly people. If Reno had unequivocally indicated she could not be fair to the accused because of the age of the victims, there might have been cause for her removal as a juror. Such was not the circumstance here, and the mere suspicion raised by the form of answer to questions did not merit an excuse for cause. The trial judge was not in error in refusing to excuse Reno for cause.

■■ We cannot agree with the defense that the trial judge abused his discretion and allowed the State to delay examination of physical evidence. The record is devoid of any attempt by the defense to examine physical evidence between the date of the State's answer to the defense discovery motion, May 18, 1976, and the week before the start of trial on October 21, 1976. Since the jury had been selected and the trial was about to begin, the judge ordered that the defense would be given time to examine each piece of evidence as it was about to be presented at trial. In light of the fact that defense counsel made no effort during the pretrial period to examine the physical evidence, and that the jury was impaneled and trial was about to begin, the trial court cannot be said to have abused its discretion in the foregoing respect.

■■ Nor can we accept defendant's argument that the trial court committed reversible error in the manner in which it enforced its own order. The evidence made subject of the order was part of that offered in connection with the Strombeck case. It is, therefore, not necessary for us to reiterate a discussion of its admission into evidence. Rather, we isolate the contention of defendant that the trial court's contradiction of its own discovery order constitutes reversible error. We do not agree with that contention. There was no showing of surprise by or prejudice to defendant, only an assertion of a misunderstanding which created a purported false sense of security. Without a showing of some surprise or prejudice done to defendant by the trial court's admission of the exhibits, there is no error. *People v. Jones* (1973), 13 Ill. App. 3d 684, 687, 301 N.E.2d 85, 88.

We agree with the State that none of the conduct of the prosecution was so irresponsible as to provide grounds upon which to reverse the conviction. The defendant presents a cluster of approximately 18 instances in which he alleges improper conduct on the part of the State. The instances divide basically into two groups; those made in the presence of the jury, and those made out of its presence. The only law defendant cites with respect to statements made out of the jury's presence

is a United States Supreme Court case which specifically ruled on statements made by prosecutors during trial *before a jury. Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.

■■ As for the statements made by the prosecution before the jury, the obligation of this court, in review, is to determine whether the prosecution did or said anything in argument, the effect of which was to inflame the passion or arouse the prejudice of the jury against defendant without throwing any light on the question. (*People v. Dukes* (1957), 12 Ill. 2d 334, 342-43, 146 N.E.2d 14, 18.) A review of the record reveals this case involved a high level of bickering between all counsel which resulted, at times, in unnecessary remarks by both sides. Nevertheless, none of those remarks can be said to have constituted a material factor in the conviction of defendant, nor was prejudice to defendant a probable result. *People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363, 372; *People v. Watson* (1977), 47 Ill. App. 3d 665, 672, 365 N.E.2d 95, 99.

The defendant contends further that the trial court erred in refusing to call Johnny Thomsen as a court's witness. The decision to call a witness as a court's witness is within the discretion of the court. Any such decision will not be disturbed on appeal, absent a showing of abuse of that discretion.

■■ In order for a trial judge to consider calling a witness as a court's witness, the party asking the court to adopt the witness must lay a proper foundation. That foundation requires a showing that the witness' integrity or veracity is doubtful, that neither side desires to vouch for the accuracy of his testimony, and that the testimony sought to be elicited is necessary to prevent a miscarriage of justice. *People v. Robinson* (1977), 46 Ill. App. 3d 713, 717-18, 361 N.E.2d 138, 141-42.

The record indicates the State listed Johnny Thomsen as its witness but never called him to the stand. This left the defense in a position of having to call Thomsen as its own witness in order to elicit testimony about an alleged exchange of stolen property by Thomsen to defendant. The defense urged that the witness was hostile and that cross-examination was desirable and necessary. The trial judge was careful to ask the State if by refusing to call Thomsen it was trying to keep testimony from the jury that might be favorable to the defendant. The State's reply was in the negative.

■■ The State asserted, and we agree, that the defense failed to show the hostility of the witness. The witness could have testified under direct examination without harm to the defendant. The defense failed to factually relate the testimony of the witness to issues in the case. Instead, the defense sought merely to avail itself of the tactical advantage of cross-examination. The trial judge was thorough in his questioning of counsel for both parties prior to ruling. The trial court could find no showing

which mandated calling Thomsen as a court's witness. We find no error in that ruling.

■■ Reserve Harvey police officer Murray filled out a field contact card to report a routine field stop. Over objection, the card was introduced at trial by the State. Its purpose was to identify the defendant as being in a certain place at a certain time. That objective had already been accomplished by both the testimony of Officer Murray and a cab driver who testified to picking up defendant at approximately the same time and the same place. The card was in no way crucial to the case against defendant but was cumulative in effect. No prejudice occurred by its admission into evidence.

Finally, the defendant maintains that the State based its case upon circumstantial evidence and failed to prove guilt beyond a reasonable doubt. Whether a defendant has been proved guilty beyond a reasonable doubt is a matter for the trier of fact and will not be disturbed on review unless the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Chapman* (1977), 49 Ill. App. 3d 553, 557, 364 N.E.2d 577, 580.) Circumstantial evidence is sufficient to sustain a conviction, and the trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. Rather, it will be sufficient if all of the evidence taken as a whole satisfied the trier of fact beyond a reasonable doubt. *People v. Williams* (1977), 66 Ill. 2d 478, 485, 363 N.E.2d 801, 804.

●■ There is no issue here as to whether the proof was circumstantial. The identity of the killer was not established by any single piece of evidence. For this reason, the entirety of the evidence presented was taken into consideration by the jury in reaching its conclusion of guilt beyond a reasonable doubt. The defendant seeks in his argument to segregate each piece of evidence and locate the doubt therein. That approach is improper. Taking into consideration the positive identification of defendant in Harvey on January 15, 1976, the collective set of properties found in possession of defendant's wife and sister, the recovery of the $1000 certificate from Albert Beard, the falsity of defendant's alibi, and the connection of the defendant to a crime having a common scheme and method with the one before us, the evidence in this case was neither unreasonable, improbable, or unsatisfactory in concluding that the defendant had been proved guilty beyond a reasonable doubt.

Based on the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN and ROMITI, JJ., concur.