

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. AP-76,328

### MABRY JOSEPH LANDOR, III., Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 1194597 IN THE 209TH DISTRICT COURT
### HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined. PRICE, and HERVEY, JJ., concurred.

In April 2010, appellant was convicted of the capital murder of a peace officer and sentenced to death.[1] Direct appeal to this Court is automatic.[2] Appellant raises six points of error. Finding no reversible error, we affirm the conviction and sentence.

## I. BACKGROUND

### A. Events from the Perspective of Witnesses and Law Enforcement

---

[1] TEX. PENAL CODE §19.03(a)(1); TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise indicated, all future references to articles are to the Code of Criminal Procedure.

[2] Art. 37.071, §2(h).

### 1. *Before the Incident*

Lakedra Franklin was appellant's ex-girlfriend and the mother of his three children. We do not know when appellant began obsessively calling her, but cell-phone records admitted at trial showed that, from five seconds after midnight on December 7, 2008, until 8:44 that morning, appellant called her at least eighty-nine times.[3] Communication between the two phones occurred at least twenty-two times between midnight and 4:14 a.m., at least twenty-nine times between 4:26 and 5:42 a.m., at least twenty-two times between 4:42 and 7:04 a.m., and at least eighteen times between 7:06 and 8:11 a.m.[4]

At 6:08 a.m., Officer James Lowery of the Houston Police Department (HPD) answered a disturbance call from Franklin's apartment. In the parking lot, he encountered appellant, who was smoking a cigarette. Appellant denied knowing anyone in Franklin's apartment and said he was waiting for his cousin. Officer Lowery later attempted to confront appellant, who ran. Officer Lowery chased him but lost him. Officer Lowery noticed that appellant's hair was a small afro and that he was dressed in black. There was a scar near one of appellant's eyes.

At 7:09 a.m., HPD Officer Darrell Williams answered a second disturbance call from

---

[3] On direct examination, the cell-phone expert testified that 187 communication events occurred between appellant's cell phone and Franklin's cell phone, with 178 of those events originating from appellant. On cross-examination, defense counsel pointed to an idiosyncracy in the Cricket cell-phone-carrier reporting system that could cause a single call to be reported as two lines of information if the sender and receiver were both subscribers to the company's network, as was the case here. The expert was surprised by this information and acknowledged that the computer program used to count the events would have counted any duplicate lines as a separate call. On redirect, the prosecutor pointed out that dividing all of the calls by two would still leave eighty-nine calls made by appellant.

[4] The cell-phone records reported forty-four, fifty-eight, forty-five, and thirty-seven lines of information for each of these respective time periods.

Franklin's apartment. Officer Williams warned appellant on the phone that threatening someone was unlawful and advised him to stop calling Franklin and to stay away from the location. From 8:11 to 8:44 a.m. there were no more than six calls made to or from appellant's cell phone.[5]

## 2. *The Incident*

HPD Officer Timothy Abernethy would soon become a murder victim. He met with HPD Officer Derrick Skinner on a disorderly conduct call at 8:30 that morning. Shortly after leaving the location of that call, Officer Abernethy conducted a traffic stop of a Red Dodge Durango. The Durango belonged to appellant's step-brother, but appellant was driving it. On his on-board computer, Officer Abernethy checked the license-plate number, which was registered in the step-brother's name and at an associated address. What Officer Abernethy did not know was that appellant was on parole for felony DWI, was driving without a license, and was in possession of a firearm.

Saul Benitez, a resident at the Luxor Park apartment complex, saw the Durango pull into the complex, followed by Abernethy's patrol car with its flashing lights on. Benitez saw appellant get out of his vehicle and immediately run away. Officer Abernethy yelled at appellant to stop and began chasing him. After Benitez lost sight of both individuals, he heard gunshots. Benitez went inside and began writing down the Durango's license-plate number.

Ditreuchie Brazil, who made her living as a security guard in Louisiana, was visiting her son and daughter-in-law, who lived at the complex. Upon hearing two gunshots, Brazil ran to the window, hearing four or five more gunshots as she did so. When she looked out the window, she

---

[5] The cell-phone records reported six "communication events," some of which were to appellant's residence, rather than Franklin's phone.

saw Officer Abernethy chasing appellant down the sidewalk. She then saw appellant duck behind a building, turn around, and shoot the officer. After Officer Abernethy fell to the ground, appellant walked over close to the officer's head and shot the officer in the head. Brazil shouted to her son that an officer had been shot. She saw appellant leave, acting calm. She got a good look at him.

Upon hearing gunshots, Michael Triggs looked out the window and saw Officer Abernethy on the ground and appellant running away with a gun in his hand. Triggs saw appellant's face clearly and noticed that the gun was a semiautomatic weapon. After hearing gunshots, April Alfred went outside and saw Officer Abernethy on the ground with blood coming out of his mouth. After feeling his pulse, Alfred went inside to retrieve her cell phone and some towels to apply to the officer's wounds. In a second-floor apartment, Cynthia Chatman heard gunshots. After lying on the floor for awhile, she opened her door and saw Officer Abernethy down on the grass. Triggs, Alfred, and Chatman each called 911.

As Benitez was writing down the Durango's license-plate number, appellant came back to the vehicle and drove away. Benitez got a good look at appellant's face but was able to write down only the first four digits of the license-plate number. After appellant drove away, Benitez ran to find the officer, who was lying on the ground in a puddle of blood. Benitez then went back to his apartment and called the police and was told that someone was already coming.

Officer Abernethy died soon thereafter.

### 3. *Appellant's Capture*

At 8:40 a.m., Officer Skinner received an emergency dispatch to assist an officer. Using his siren and flashing lights, he sped to the scene, arriving a couple of minutes later. There, he was flagged down and directed to Officer Abernethy. Officer Skinner talked to Benitez, who gave him

information about the suspect and the vehicle, and Skinner radioed this information to the police dispatcher.

After hearing the dispatch to assist an officer, Officer Williams also came to the scene. He found Officer Abernethy's patrol car, with its lights flashing, the door open, and the keys in the ignition. Reviewing the readout on Officer Abernethy's computer screen, Officer Williams obtained and reported the full license-plate number and the VIN of the Durango, as well as the address shown on the registration.

Deputy Gary Smidt of the Harris County Sheriff's Office was patrolling near the area with a trainee, Deputy Chris Crouch. Transtar, the traffic-mobility unit of Harris County, issued an "officer down" dispatch. Deputy Smidt checked the license-plate number on his on-board computer and determined that the registration address was far from his area. He then ran the owner's name (appellant's step-brother) and retrieved an address on Hombly Street, which was close to where he was. Deputy Smidt proceeded to Hombly Street. At 9:15 a.m., while on a street that crosses Hombly, Deputy Smidt saw the Durango in the driveway of the address he had retrieved, and he noted that the description and license plate matched the dispatch.

Deputy Smidt then called other sheriff's units to set up a perimeter, and he moved his vehicle into a position outside of the direct line of sight of persons in the house. He pulled out his shotgun and waited for other units to arrive. As sheriff's units moved into position, an HPD patrol car arrived on the scene, and an HPD helicopter arrived overhead. At this time, Deputy Smidt spied appellant smoking a cigarette while standing on a sidewalk underneath a tree.

Upon seeing the HPD officer leave his vehicle and approach appellant, Deputies Smidt and Crouch did the same. Deputy Smidt called out to appellant three times, but appellant ran, and

Deputy Smidt began chasing him. Appellant broke through fences and ran through several back yards. Twice, appellant's positioning prompted Deputy Smidt to fire his shotgun, but he missed both times. After at least five broken fences or gates, and after another deputy had joined in the chase, a bystander pointed the deputies to an area where appellant was hiding behind a trash can between two houses. After being ordered to come out several times, appellant finally complied and was taken into custody. Deputy Smidt aimed his shotgun at appellant while appellant was being handcuffed by another deputy.

### 4. *Further Investigation*

HPD took custody of appellant. Officer Michael Walding placed bags on appellant's hands to preserve any evidence of gunshot residue. When asked about appellant's demeanor when Officer Walding first encountered him, Officer Walding replied, "He didn't say anything. I didn't ask him any questions either. He didn't say a word. He was agitated after he was in the back of the patrol car, but he didn't say anything to me or any other officers that were around me."

Appellant was returned to the Luxor Park apartment complex for possible identification. He was shown to Triggs, who recognized him as the man he had seen earlier. Triggs later identified appellant in the courtroom and testified that there was no doubt in his mind that appellant was the person he saw. When asked if he noticed anything different about appellant when he was brought back to the scene, Triggs said that appellant had shaved his head since the first time he saw him.

As Benitez was preparing to go to the police station to give a statement, he saw appellant with some officers at the scene. He recognized a mark on appellant's left cheek, though he noticed that appellant was wearing different clothing and had shorter hair. Benitez told the officer who was escorting him that the person at the scene was the same person he had seen earlier. Benitez also

identified appellant in the courtroom.

Officer Walding had followed the patrol car carrying appellant to the Luxor Park apartment complex. At the scene, Officer Walding remained with appellant the entire time, about an hour and a half. The patrol car that originally transported appellant got a flat tire, so appellant was placed in Officer Walding's car, and Officer Walding drove him to the HPD homicide division. Officer Walding had no conversations with appellant.

At the homicide division, Sergeant Brian Harris and Sergeant Bobby Roberts interviewed appellant. According to Sergeant Harris's trial testimony, the following occurred: Appellant was read Article 38.22 warnings and asked if he understood each warning. He responded affirmatively each time. Appellant was then asked if he wanted to waive the warnings. Again, appellant responded affirmatively. Appellant was fed lunch, consumed quite a few bottles of water, and was allowed to use the restroom. No promises or threats were made, and appellant never asked for a lawyer or to terminate the interview. Appellant ultimately gave officers a video-recorded confession.

Officers noticed that appellant had a very bad haircut. Photos showed that his head had been shaved but there were splotchy sections of hair. Appellant purported to help officers look for his gun. Despite his assistance and other diligent efforts to find the gun, it was never recovered.

Appellant's father gave consent to search his house on Hombly Street. The police found two pairs of hair clippers, clumps of hair in two or three places inside the house, hair inside a trash bag, and black clothing consistent with descriptions of the clothing worn by the perpetrator.

The next day, police officers showed Brazil a photospread, and she immediately picked appellant's photo. She also identified appellant in court.

Four .40 caliber casings were found at the crime scene. Toolmark analysis indicated that the

casings were from bullets that were all fired from the same gun. The distribution of the casings indicated that the shooter was advancing or progressing along the sidewalk. Bullets or bullet fragments found in Abernethy's body, in a car tire, and in the ground underneath where Abernethy's body had lain[6] showed characteristics that were consistent with .40 caliber bullets.

Two fingerprints from the driver's door—one on the inside and one on the outside—matched appellant. Gunshot-residue analysis of appellant's hands found no residue on his left hand but was inconclusive as to the right hand.[7] Gunshot-residue analysis of the steering wheel and gearshift of the Durango yielded positive results.[8]

Officer Abernethy's gun was clean, the cartridge magazine was full, and one cartridge was in the chamber, indicating that his gun had not been fired that day.

An autopsy revealed that Officer Abernathy had been hit by three bullets. One bullet had struck his left arm but did not penetrate (perhaps because of a bullet-proof jacket). Another bullet passed through Officer Abernethy's neck. Because that bullet did not strike the spinal cord, carotid artery, or any vital organ, Officer Abernethy could have survived that wound. But a fatal wound was inflicted by a third bullet, which struck Officer Abernethy's head. That bullet entered the back of the head and exited the front of the head above the left eye.[9] The gunshot wound to the head was a "loose contact wound," which meant that part of the gun barrel was in direct contact with the scalp

---

[6] An officer had to dig around the area before finding the bullet lodged inside the ground.

[7] Two particles of gunshot residue were found on the right hand. Anything below three particles was considered inconclusive because it could be the result of a secondary transfer.

[8] The analysis found five particles in each location.

[9] Bullet fragments were recovered from the neck and head wounds.

when the gun was fired.

## B. Appellant's Video Confession

As we observed above, Sergeant Harris and Sergeant Roberts obtained a video-recorded confession from appellant. All of the warnings required by Article 38.22 were given near the beginning of the video,[10] before any discussion about the incident. Appellant was asked after each warning if he understood it, and appellant answered affirmatively each time. Sergeant Harris then told appellant that he had to "voluntarily and knowingly waive, that means give up those rights" in order for Harris and Roberts to hear appellant's story. Sergeant Harris then asked, "Do you understand all that? Are you ready to tell us your story? Are you ready? You may not ever be ready to accept what happened, ok, but we want to hear about the events that led up to what took place today, do you understand that?" Appellant responded, "Yes."

On the video, appellant gave the following version of events: Appellant took his brother's keys and drove the Dodge Durango. Upset and contemplating suicide, he brought with him a .45 automatic pistol. At some point, appellant began to calm down and headed for home. On his way home, he was "pulled over." Appellant "got out of the car" because he was on parole and was not supposed to have a firearm. Then he fell, and the gun went off. The police officer then reached for his gun, and appellant started shooting. Seeing that the officer was dead, appellant returned to his vehicle and drove home, throwing the gun out of the car somewhere along the way. After he arrived home, appellant cut his hair. A little while later, the police arrived, and that was "[t]he end of my life."

In the interview, appellant made several statements that could be taken as expressions of

---

[10] *See* Art. 38.22, §§2(a), 3(a)(2).

remorse. After referring to "the end of my life," appellant said, "Sorry, I didn't mean for that to happen." Later, when asked if there was something he could "say to that officer's family," appellant responded, "I'm sorry. I got scared. It's a freak accident, a spur of the moment type thing. I'm contemplating suicide myself. It was wrong to be armed." When asked what he would say to Lakedra and his child, appellant responded, "I'd take it all back." When asked if he wanted to say anything else, appellant said, "This is the worst mistake of my life."

## C. Appellant's Trial Testimony

Appellant testified at trial that he drove the Red Dodge Durango to the Luxor Park Apartments to visit an aunt and that he was not carrying a firearm that day. After he was pulled over by a police officer, he got out of the vehicle and ran. Appellant claimed that he did so because he was driving without a license while on parole for DWI. Appellant further claimed that he heard what sounded like gunshots, turned around to see what was happening, but slipped and fell. After determining that he was not being followed, appellant said, he returned to the Durango and drove home. Appellant admitted that, while at home, he took off his black clothing and shaved his head.

Appellant also testified that, about ten minutes after he was taken back to the scene of the incident, an officer approached the patrol car he was in and threatened him. Appellant further claimed that, at the homicide division, he invoked his right to terminate the interview after he was told of that right, but the interrogating officer ignored him and continued asking questions. And appellant testified that ten to twelve officers were packed right outside the door during the interview. Appellant also said that Roberts told him that "they was the good guys and there would be people that would come out from the hall that would poke me in my chest." He further testified that he was told that the only way to beat the death penalty was to talk and make himself look less like an animal.

Appellant claimed that the confession was untruthful because it was given out of fear for his life. When asked why was he in fear, appellant replied that it was because of the shots being fired, being told that he was never going home, and several things that he "considered as a threat," though appellant did not specify what they were. Appellant admitted that he lied when he first told the officers that he was not even present at the scene that day.

## II. ADMISSION OF CONFESSION

In point of error one, appellant contends that "uncontroverted allegations of coercion rendered his custodial statement inadmissible as a matter of law." He argues that his own testimony with respect to three facts was uncontroverted: (1) that he was shot at, (2) that he was threatened by a police officer while he was sitting in a patrol car, and (3) that an officer dropped his knee on appellant's head at the time appellant was arrested. Conceding the general rule that the trial court is the sole judge of the credibility of the witnesses, he nevertheless maintains that there is an exception in the confession context for uncontroverted allegations of coercion and that the trial court was required to credit his uncontroverted testimony. He further argues that crediting this testimony compels a finding that his confession was involuntary and should have been suppressed.

### A. Circumstances Surrounding the Confession

Sergeant Harris and appellant were the only individuals to testify at the pretrial suppression hearing. We turn to their respective versions of the events relating to appellant's confession.

### 1. *Pretrial Testimony of Sergeant Harris*

According to Sergeant Harris, he and Sergeant Roberts began an oral, unrecorded interview with appellant. At the time the interview was conducted, Sergeant Harris was aware that a sheriff's deputy had shot at appellant in the course of apprehending him. At the beginning of the interview,

appellant was read all of the Article 38.22 warnings and asked if he understood each of them. Appellant answered affirmatively. Sergeant Harris then asked appellant if he would intentionally and knowingly give up his rights, and appellant stated that he would and that it was "no big deal" because he had nothing to hide. Because the noon hour was approaching, Sergeant Roberts brought some food from McDonald's and ate lunch with appellant. While appellant and Sergeant Roberts were eating, Sergeant Harris left for fifteen to twenty minutes to do some more investigation. Upon his return, Sergeant Harris began to ask appellant about the incident.

During the course of the interview, appellant drank at least five twelve-ounce bottles of water and a big glass of Sprite. Appellant was allowed to use the restroom, and although he was accompanied on the restroom breaks, other officers in the building were cleared from the hallway during that time. Sergeant Harris told appellant that he was not being taped or recorded at that time, and for the most part, what they talked about would not be admissible. So, Sergeant Harris continued, if appellant "wanted his side of the story," it had to be in writing or on video.

Sergeant Harris further testified that no promises or threats were made to appellant, and appellant never invoked his right to counsel or his right to terminate the interview. Once during the interview, appellant looked up and asked if Sergeant Harris thought appellant should get an attorney. Sergeant Harris then reiterated that appellant had a right to have an attorney present to advise him prior to and during any questioning and asked appellant if he understood that right. Appellant nodded his head up and down. Sergeant Harris then asked, "Are you telling me now that you want an attorney?" Appellant responded by shaking his head from right to left and said that he wanted to continue with the interview.

At some point during the interview, during an emotional part, Sergeant Harris said, "Look,

I would prefer you just stop this interview rather than you continue on with the same old story, the same old lies I had been hearing." Appearing almost apologetic, appellant then related a version of events that was later conveyed, for the most part, on the video. Appellant agreed to memorialize his statements, and when given the choice of a written statement or a video, appellant chose to do a video.

## 2. *Appellant's Pretrial Testimony*

According to appellant, the following events occurred at the time of his arrest: He was walking in the neighborhood when an officer walked toward him with a shotgun. Upon seeing the officer cock the shotgun, appellant "started moving a little faster," and the officer shot at him. When appellant was caught, he was ordered onto the floor. When appellant complied, an officer dropped his knee on appellant's head and handcuffed him.[11] When appellant got up, he was walked to the police cruiser, bags were placed on his hands, and he was placed inside the officer's car. Later, appellant was taken back to the scene, and a "Spanish" officer opened the cruiser door slightly and said, "You're lucky it wasn't me. I would have shot you in the mouth." Appellant did not know the Spanish officer's name, and he "wasn't even controlling the case."

Appellant testified that the following occurred during the interview with Sergeants Harris and Roberts: When he was told he could ask for a lawyer or terminate the interview, appellant told them that he wanted to terminate the interview. After two hours, Sergeant Harris returned and made an "indirect threat," playing good cop/bad cop, saying, "We're the good guys, but we got guys out there that come in and poke you in the chest." At that time, appellant's "nerves [were] gone," and he "was

---

[11] Appellant described the law-enforcement officer who kneed him as "he," but it is unclear to whom the "he" refers.

in fear for [his] life." In addition, whenever the door was opened, the hall was crowded with police officers, although the hall was cleared when he was taken to the restroom.

Under cross-examination, appellant acknowledged that Sergeant Harris gave him an opportunity on the video recording to say anything else he would like anyone to know. Nevertheless, appellant admitted that he said nothing about the Spanish officer threatening him, or about Sergeant Harris's good cop/bad cop statements, or about any other mistreatment appellant might have suffered at the hands of the police.

At the end of the pretrial hearing, appellant asked to add one more comment. He stated that he was told he was under arrest, was never going home, could see his father but was not going to have contact, and the only way appellant "would beat the death penalty was to testify or say something" so he "wouldn't look like a monster."

### 3. *The Trial Court's Findings*

The trial court issued findings of fact and conclusions of law regarding appellant's confession.[12] They include findings that appellant "was not promised anything in exchange for his statement" and that "the officers did not threaten [appellant] or use any intimidation, coercion, or force against [appellant]." The trial court also found that appellant did not invoke his right to an attorney or his right to terminate the interview. Other findings were made that were consistent with Sergeant Harris's testimony at the pretrial hearing. In addition, the trial court found the testimony of Sergeant Harris to be "true and credible." Finally, the trial court made a finding that appellant's

---

[12] When we received the appellate record, the trial court had not made any findings. Pursuant to TEX. R. APP. P. 34.5(c)(2), we ordered the trial court to prepare and file findings, *Landor v. State*, No. AP-76,328 (Tex. Crim. App., September 29, 2010) (not designated for publication), and the trial court complied with that order.

testimony was not credible:

> The defendant testified as to certain alleged "indirect threat[s]" he claimed placed him "in fear for [his] life" and rendered his statement involuntary. After viewing the demeanor of the defendant while testifying and considering the circumstances surrounding his statement as alleged in his testimony as compared with the circumstances surrounding the defendant's statement as testified to by Sergeant Harris, the testimony of the defendant is found to be untruthful and not credible.[13]

## B. Analysis

### 1. The Trial Court Was Not Required to Believe Most of Appellant's Testimony

#### a. Role of the Trial Court

We have stated numerous times that the trial court is the sole judge of the credibility of the witnesses and may believe or disbelieve any witness who testifies at a suppression hearing, and we have said that this principle is particularly true where the suppression motion is based on the voluntariness of a confession.[14] This principle was reinforced by our decision in *Guzman v. State*, which held that a trial court must be afforded "almost total deference" to its determinations of historical fact, especially when those determinations turned upon an evaluation of credibility and demeanor,[15] and by our decision in *State v. Ross*, which held that a trial court was free to disbelieve a witness even when the testimony was uncontroverted.[16] We have continued to hold that a trial

---

[13] Brackets in original; citation to record omitted. In connection with this finding, the trial court cited to portions of the record that included appellant's knee-to-the-head allegation, the "Spanish cop" allegation, the good cop/bad cop allegation, and appellant's claim that he asked to terminate the interview.

[14] *Delao v. State*, 235 S.W.3d 235, 238-39 & ns.6, 7 (Tex. Crim. App. 2007) (citing cases).

[15] 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[16] 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

court may believe or disbelieve all or part of a witness's testimony even if that testimony is uncontroverted,[17] and we have so held when determining whether a confession was involuntary.[18]

Appellant relies upon *Smith v. State*,[19] *Sherman v. State*,[20] and *Farr v. State*[21] for the proposition that an exception exists in the confession context for uncontroverted allegations of coercion. The rule was stated this way in *Farr*, "It has long been the law of this State that whenever the testimony of the accused as to alleged coercive acts is undisputed, then as a matter of law the confession is inadmissible."

*Smith*, *Sherman*, and *Farr* all involved witnesses that the State failed to produce.[22] In *Smith*, the defendant testified that he had been beaten and threatened by New Orleans police, but no New Orleans police officers testified.[23] In *Sherman*, the defendant claimed that the Chief Deputy threatened him with the death penalty if he did not sign a confession, but the Chief Deputy was not called as a witness.[24] In *Farr*, the defendant identified two police officers involved in misconduct: one officer slapped and choked him, while the other police officer told the defendant to confess or

---

[17] *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

[18] *Masterson v. State*, 155 S.W.3d 167, 171 (Tex. Crim. App. 2005).

[19] 547 S.W.2d 6 (Tex. Crim. App. 1977).

[20] 532 S.W.2d 634 (Tex. Crim. App. 1976).

[21] 519 S.W.2d 876 (Tex. Crim. App. 1975).

[22] *Smith*, 547 S.W.2d at 8; *Sherman*, 532 S.W.2d at 635-36; *Farr*, 519 S.W.2d at 879. *See also Sims v. Georgia*, 389 U.S. 404, 406 (1967) ("The State had every opportunity to offer the police officers, whose failure to testify had already been commented upon here, to contradict petitioner's version of the events.").

[23] 547 S.W.2d at 7-8.

[24] 532 S.W.2d at 635-36.

the first officer would kill him.[25]  Neither officer was called to testify.[26]  Although other witnesses

testified in each of these three cases, none of them were shown to have been in a position to observe

whether the events alleged by the defendant had occurred.[27]  And the absences of the witnesses that

were involved in the events were not satisfactorily explained.[28]

First, we note that the rule in these cases was derived, in part, from language in Supreme

Court cases,[29] but the Fifth and Seventh Circuits have cautioned that federal law does not always

require courts to credit a defendant's uncontroverted allegations of coercion.[30]  Given our holdings

---

[25]  519 S.W.2d at 878.

[26]  *Id.*

[27]  *Smith*, 547 S.W.2d at 8 (FBI agent who conducted interview did not know whether New Orleans officers, who had custody of the defendant, had engaged in abusive or threatening behavior); *Sherman*, 532 S.W.2d at 636 (two officers who testified at hearing neither denied or could deny the defendant's allegation that the Chief Deputy threatened him because "there was no showing that either was present when the statements were allegedly made"); *Farr*, 519 S.W.2d at 879 (officer who conducted interrogation admitted that "he had no personal knowledge of any occurrence before appellant was brought to the station").

[28]  *Smith*, 547 S.W.2d at 8 n.2 (quoting from *Sherman*); *Sherman*, 532 S.W.2d at 636 & n.2) (observing that the Chief Deputy's "absence was wholly unexplained" and remarking that "if the State had presented a reasonable explanation of [his] failure to testify, such as his death or their inability to locate him, the trial court would have been free to disbelieve appellant's testimony"); *Farr*, 519 S.W.2d at 878 ("There is no showing in the record that Officers Hernandez and Lubbock were unavailable to testify.").

[29]  *See Farr*, 519 S.W.2d at 876 (quoting from and discussing *Haynes v. Washington*, 373 U.S. 503 (1963) and *Sims v. Georgia*).

[30]  *Pemberton v. Collins*, 991 F.2d 1218, 1225(5th Cir. 1993) ("Uncontroverted evidence of coercion might well raise a serious question about the voluntariness of the confession, *see Haynes v. Washington*," but "federal law knows no such hard-and-fast rule" of exclusion.  "*Haynes* is concerned with the motivation of the state in failing to controvert testimony of coercion."); *Sprosty v. Buchler*, 79 F.3d 635, 645 (7th Cir. 1996) ("[U]nlike Sprosty's witnesses, Haynes' testimony had never been specifically discredited by the trier of fact . . . .The trial court in our case was entitled to

(continued...)

that a trial court can disregard uncontroverted testimony, it cannot be the case that a trial court is required to believe a defendant's allegation of coercion solely on the basis that it is uncontroverted. Moreover, there is a difference between (a) the failure of the State to produce a witness within its control (as occurred in *Smith*, *Sherman*, and *Farr*) and (b) the State producing the witness, with neither the State nor the defense asking him specifically about the defendant's allegations of coercion (as occurred here).

### b. Scope of Review

Here, the allegations that appellant contends were uncontroverted all related to events that occurred before he arrived at the homicide division. Sergeant Harris, the State's only witness at the suppression hearing, was not in a position to observe any of those events. But, citing *Gutierrez v. State*,[31] appellant acknowledges that an argument could be made that the admissibility of his confession was consensually re-litigated at trial.[32] In *Rachal v. State*,[33] for instance, we found consensual re-litigation to have occurred with respect to the type of claim before us.[34] In that case, Detective Phillips agreed to step out of the room to allow Detective Brown to spend ten minutes

---

(...continued)
disbelieve Sprosty's witnesses without regard to whether the officers had contradicted their testimony, or were simply unable to remember whether Sprosty had requested counsel.").

[31] 221 S.W.3d 680 (Tex. Crim. App. 2007).

[32] *See id.* at 687.

[33] 917 S.W.2d 799 (Tex. Crim. App. 1996).

[34] *Id.* at 808-10 (challenge to voluntariness of confession).

alone with the defendant.[35] At the suppression hearing, the defendant testified that Detective Brown threatened him during those ten minutes.[36] Detective Brown did not testify at the suppression hearing, but he testified at trial and denied that he engaged in coercive conduct.[37] Defense counsel did not object to this testimony and, in fact, fully participated in the inquiry.[38] We held: "Where the State raises the issue at trial either without objection or with the subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate to our review."[39] We also explained that "it would be unreasonable to ignore trial evidence in our review of the court's suppression decision only to be confronted by the evidence in our consideration of whether the error was harmless."[40]

In the present case, part of the defense's trial strategy was to attack the voluntariness of the confession. Appellant challenged the voluntariness of the confession through his own trial testimony, including testimony about the shots fired at him and general testimony about a threat made against him while he was in a patrol car. Defense counsel's cross-examination of the witnesses also addressed the shots fired by Deputy Smidt, what happened when appellant was finally caught,

---

[35] *Id.* at 808.

[36] *Id.*

[37] *Id.* at 809. In addition to testifying on direct examination that the defendant's confession was offered without duress, coercion, threat, or unlawful inducement, Detective Brown specifically denied the defendant's allegations in response to defense counsel's cross-examination questions. *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

and whether Officer Walding was in appellant's presence during the entire time appellant was in custody at the Luxor Park Apartments (which included the time appellant was allegedly threatened by a Spanish officer). Under these circumstances, it is appropriate for us to consider the testimony both at the suppression hearing and at trial in resolving appellant's involuntary-confession claim.[41]

*c. Appellant's Specific Allegations*

We turn to the three allegations that appellant contends were uncontroverted: (1) that he was shot at, (2) that he was threatened by a police officer while he was sitting in a patrol car, and (3) that an officer dropped his knee on appellant's head at the time he was arrested. With respect to the first allegation, both sides agree that Deputy Smidt fired two shots at appellant, but Deputy Smidt's trial testimony differed from appellant's testimony regarding the timing of those shots. Appellant's testimony suggested that Deputy Smidt fired almost right away with no provocation, while Deputy Smidt indicated that he fired shots in the middle of a chase when appellant's position posed a potential danger to the him. The trial court was free to believe that the shots were fired under the circumstances testified to by Deputy Smidt.[42]

As for the second allegation, the trial court was free to disbelieve it in its entirety. Before the State can be held at fault for failing to produce a witness, it must first be established that such a witness exists. The only evidence of the existence of a "Spanish officer" who threatened appellant

---

[41] This conclusion is premised on the assumption that a review that includes the trial record would be more favorable to the trial court's ruling than a review limited to the suppression hearing. We also note that appellant renewed his objection at trial. Nothing we say in this opinion affects the rule that a trial court's ruling on the admissibility of evidence can be upheld based solely on the evidence before the trial court at the time. *Page v. State*, 213 S.W.3d 332, 337 (Tex. Crim. App. 2006).

[42] It is not necessary to address the question of whether the trial court may disbelieve testimony agreed to by both sides.

was appellant's own testimony, and the trial court was free to disbelieve that testimony. But even if we were to inquire further, Officer Walding testified that appellant was in his presence during the entire time he was in custody at the apartment complex – the time during which, according to appellant, the Spanish officer talked to him. Officer Walding's testimony did not mention a Spanish officer, and neither of the parties broached the subject in their questioning.

The trial court was also free to disbelieve the third allegation in its entirety. Deputy Smidt was present during appellant's arrest, and defense counsel had the opportunity to question him about whether any of the deputies engaged in the behavior that appellant had described.

Further, appellant made other allegations of coercion that he does not now dispute were controverted. He accused Sergeants Harris and Roberts of ignoring requests to terminate the interview and of telling him that they could bring in other officers who would "poke him in the chest." But Sergeant Harris testified that no threats were made and that appellant never asked to terminate the interview. The trial court was free to believe that these particular, disputed allegations of coercion were untrue and that the falsity of these allegations reflected poorly on appellant's credibility with respect to his other allegations.

### 2. *Any Testimony the Trial Court Was Required to Believe Did Not Establish that the Confession Was Involuntary*

In order for a confession to be rendered involuntary by police coercion, the police must have engaged in coercive misconduct[43] that caused the suspect's will to be overborne.[44] For official conduct to qualify as the type of conduct that renders a confession involuntary, it must not simply

---

[43] *Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986); *Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010).

[44] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973); *Contreras*, *supra*.

be "coercive" but must also be "wrongful."[45] A suspect's will is "overborne" if the confession is not "the product of an essentially free and unconstrained choice by its maker."[46]

With respect to the items listed by appellant as "uncontroverted," the only testimony the trial court was required to believe was that appellant was shot at. Viewing the evidence in the light most favorable to the trial court's ruling, we infer that the trial court believed that the shots occurred during the chase at times when appellant appeared to pose a potential danger to Deputy Smidt. Under those conditions, being shot at was not a circumstance that could have rendered appellant's confession involuntary. Deputy Smidt's acts of shooting did not constitute wrongful conduct. The deputy's acts were reasonable efforts to prevent appellant from turning him into appellant's next victim. Nor can we find that the shots caused appellant's will to be overborne when appellant was otherwise treated well. The shots were not in any way connected with the later efforts to elicit a confession, appellant was not threatened by any of the officers who elicited his confession, and appellant was allowed restroom breaks and given plenty of food and drink during the interrogation.

---

[45] *See Connelly*, 479 U.S. at 155 (Supreme Court of Colorado's holding that confession was involuntary despite the fact that the police "committed no wrongful acts," is flawed because it "fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other."); *Contreras*, *supra* (characterizing the issue as involving "coercive government *misconduct*"). *See also Pole v. Randolph*, 570 F.3d 922, 942 n.7 (7th Cir. 2009) ("the police interrogator must have committed wrongful acts in order for a confession to be suppressed as the product of coercion"). *People v. Weaver*, 26 Cal. 4th 876, 921, 29 P.3d 103, 127 (2001) ("The due process inquiry focuses on the alleged wrongful and coercive actions of the state . . . . Because the trial court determined that neither officer engaged in wrongful conduct," involuntariness was not shown.); *Effland v. People*, 240 P.3d 868, 880 (Colo. 2010) (Coats, J., dissenting) (criticizing majority for "[i]gnoring the importance of wrongful or improper police conduct to *Connelly*'s rationale"); *Contreras*, 312 S.W.3d at 577 n.27 (citing cases that hold that a threat to arrest a third person is not improperly coercive if officer could legally effectuate the arrest).

[46] *Schneckloth*, 412 U.S. at 225.

Over forty years ago, the Supreme Court of New Jersey addressed a similar fact situation.[47] In that case, the defendant shot and killed a police officer on the New Jersey Turnpike.[48] During a manhunt for him, the defendant was subsequently chased by another officer into a wooded area.[49] The pursuing officer saw the defendant "emerge from the far side of a stream and when the man refused to stop," the officer "fired a shot but missed."[50] When the defendant, who was "wet and cold," was ultimately captured, his wet clothes were removed; he was given a warm jacket, coffee, and cigarettes; he was offered food; and he was given the equivalent of *Miranda*[51] warnings.[52] After interrogation, the defendant subsequently gave a confession.[53] On appeal, he claimed that the trial court erred in admitting the confession because "his physical and mental condition, resulting from the vigorous and intensive 'hot' pursuit and his fear of the police were 'coercive circumstances' which convinced defendant that for his own safety he must give a statement."[54] The court upheld the confession as voluntary.[55] We likewise conclude that appellant's confession was voluntary under the similar circumstances presented.

---

[47] *State v. Kremens*, 52 N.J. 303, 245 A.2d 313 (1968).

[48] *Id.* at 304-07.

[49] *Id.* at 306.

[50] *Id.* at 306-07.

[51] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[52] *Kremens*, 52 N.J. at 307, 309, 245 A.2d at 315-16. *Miranda* had not yet been decided at the time these events occurred. *Id.* at 309, 245 A.2d at 316.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 310, 245 A.2d at 316.

But even if appellant's other two allegations were credited—the knee-to-the-head incident and the incident with the unknown Spanish officer—we could not conclude that such circumstances caused appellant's will to be overborne. Appellant has never claimed that the officers in those incidents made any attempt to persuade him to make a statement. And although appellant characterized it as a threat, the statement allegedly made by a Spanish officer was a statement about what he would have done to appellant in the past, during the chase, not about what might happen to appellant in the future. Moreover, the interrogation was at least somewhat removed in time, occurred in a different setting, and was conducted by different officers from those in the alleged incidents. The interrogating officers never attempted to exploit any of the three alleged incidents upon which appellant relies.

The United States Supreme Court has explained that, in assessing the totality of the circumstances, we look to "both the characteristics of the accused and the details of the interrogation."[56] But the incidents of which appellant complains occurred outside the interrogation setting and had no obvious connection to it. Even if the incidents were viewed as prior illegal conduct similar to an illegal arrest, any taint from that conduct would have been attenuated under our precedents. In assessing the attenuation of the taint, courts look to four factors:

(1) whether *Miranda* warnings were given;

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and

---

[56] *Schneckloth*, 412 U.S. at 226.

(4) the purpose and flagrancy of the official misconduct.[57]

Article 38.22 (*Miranda*) warnings were given to appellant. Appellant spent more than an hour at the scene after the alleged incidents and before the interrogation. There were also intervening circumstances present: Appellant was taken to a different location, given lunch, and questioned by different officers than those who allegedly engaged in misconduct. The knee incident, if it occurred, might be considered a "flagrant" abuse of authority, but its purpose would not appear to be to elicit a confession. The unknown Spanish officer's conduct, if he existed and if it occurred, seems to be neither flagrant nor aimed at securing a confession. The balance of factors would weigh in favor of finding attenuation, if an attenuation analysis were even deemed necessary.

### 3. *Harm Analysis*

But even if the statement were found to have been admitted in violation of the United States Constitution, we would find its admission to be harmless. For constitutional error to be harmless, a court must determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment."[58] When the constitutional error involves the admission of a defendant's confession, a reviewing court must "exercise extreme caution" before determining that the error was harmless.[59] Nevertheless, overwhelming evidence can render the admission of a defendant's confession harmless beyond a reasonable doubt.[60]

---

[57] *Crutsinger v. State*, 206 S.W.3d 607, 610-11 (Tex. Crim. App. 2006) (citing *Brown v. Illinois*, 422 U.S. 590, 598-99 (1975)).

[58] TEX. R. APP. P. 44.2(a).

[59] *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

[60] *Ovalle v. State*, 13 S.W.3d 774, 785 (Tex. Crim. App. 2000).

In the present case, the evidence of guilt was truly overwhelming. Appellant admitted at trial that he was present at the scene of the crime. He admitted at trial that he was stopped by Officer Abernethy and fled from him. That admission was further corroborated by an eyewitness and by the readout on Officer Abernethy's computer that showed the Dodge Durango's license-plate number. Three eyewitnesses placed appellant at the scene. One of those eyewitnesses identified appellant as the shooter, while another eyewitness identified appellant as leaving the scene with a gun in his hand. Gunshot residue was found on the Dodge Durango's steering wheel. Immediately after returning home from the incident, appellant shaved his head and changed his clothes—evincing his own consciousness of guilt.[61] Appellant further evinced his consciousness of guilt by fleeing from the sheriff's deputies through his neighborhood, damaging neighbors' fences in the process.[62] Appellant's defense to this evidence was his trial testimony that, though he was fleeing from Officer Abernethy because he did not want to be caught with a traffic violation while on parole, he fell, and some unknown assailant must have shot the officer. We conclude beyond a reasonable doubt that the jury would not have decided the issue of guilt differently if appellant's confession had been excluded.

With respect to punishment, the confession had little relevance. The confession painted the shooting as something that began as an accident and ended as an impulsive response to the officer drawing his gun, but the other evidence at trial showed a brutal, execution-style murder. The

---

[61] *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt."); *Clayton v. State*, 235 S.W.3d 772, 780-81 (Tex. Crim. App. 2007) (jury could rationally draw an inference of consciousness of guilt from a defendant's efforts to avoid apprehension).

[62] *See* previous footnote.

evidence was overwhelming that the victim was shot in the head at close range. This conclusion was supported by Brazil's eyewitness testimony, by the autopsy, and by the recovery of a .40 caliber bullet in the ground underneath where Officer Abernethy had lain. If anything, the confession was mitigating evidence, but it conflicted with all of the other evidence of how the murder occurred. The minimizing aspect of the confession might be considered evidence of appellant's failure to take responsibility for his actions, but appellant's trial testimony—denying that he was even the shooter—displayed appellant's failure to take responsibility even more clearly. In his confession, appellant admitted to being on parole, but his prior convictions and his parole status at the time of the offense were admissible at punishment anyway.[63] There is simply no reason to believe that the confession had any impact on the jury's punishment deliberations.

Point of error one is overruled.

### III. EXCLUSION OF EVIDENCE

In points of error two and three, appellant complains that the trial court erred in excluding, at trial, his testimony concerning the exact statement the Spanish police officer allegedly made to him. He claims that the trial court's action deprived him of his due-process right to present a defense and violated his right under Article 38.22, §6, to offer evidence concerning the voluntariness of his confession. He argues that the statement was not hearsay and that the trial court erred to sustain the State's hearsay objection. He also argues that he had a constitutional right to challenge the voluntariness of his confession before the jury.

### A. Preservation of Error

---

[63] *See* Art. 37.071, §2(a); *Solomon v. State*, 49 S.W.3d 356, 364-65 (Tex. Crim. App. 2001) (committing an offense while on parole is some evidence of future dangerousness).

The following occurred at trial:

[DEFENSE COUNSEL]: What happened when you got back to Luxor?

[APPELLANT]: They turned on Tidwell onto Sunforest, brought me around the back. I sit there maybe 10 minutes. I'm not sure. It was for a minute. They was still talking outside the cruiser. As I was sitting there waiting to see what was going to happen, or whatever, another cop, he comes and opens the door and threatens me and tells me --

[PROSECUTOR]: Judge, I object to any hearsay.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Without saying what the officer told you, in other words the exact words, what was he communicating to you?

[APPELLANT]: A threat.

To preserve a complaint for appellate review, the complaining party must lodge a timely complaint with the trial court that states the grounds for the ruling sought "with sufficient specificity to make the trial court aware of the complaint."[64] We have said that "all the party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."[65] As Professors Goode, Welborn, and Sharlot have explained: "Whichever party complains on appeal about the trial judge's action must, at the earliest opportunity, have done everything necessary to bring to the judge's attention the

---

[64] TEX. R. APP. P. 33.1(a)(1)(A).

[65] *Layton v. State*, 280 S.W.3d 235, 239 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

evidence rule in question and its precise and proper application to the evidence in question."[66]

This requirement applies also to a complaint that the trial court improperly excluded evidence.[67]  In *Reyna v. State*, defense counsel sought to admit evidence on the basis that it was relevant to attacking the victim's credibility.[68]  We held that defense counsel's "arguments about hearsay did not put the trial judge on notice that he was making a Confrontation Clause argument."[69]

A party who seeks to complain about the exclusion of evidence must also make an offer of proof in which "the substance of the evidence was made known to the court . . . or was apparent from the context within which the questions were asked.[70]

In the present case, defense counsel failed to preserve error because he did not communicate what he wanted to the trial court.  The prosecutor's hearsay objection immediately followed appellant testifying that the officer "threatens me and tells me."  By saying that the officer "threatens me *and* tells me," appellant seems to have been about to talk about information that was hearsay.  Defense counsel may have cleared up the matter in the next question when he elicited the information that what the officer was communicating to appellant was a threat, which would suggest

---

[66]  *See Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005) (quoting  Stephen Goode, et al., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 103.2 (2d ed. 1993)).

[67]  *Reyna*, 168 S.W.3d at 176-80.

[68]  *Id.* at 179.

[69]  *Id.*

[70]  TEX. R. EVID. 103(a)(2).

that none of the information was hearsay.[71]  But defense counsel did nothing at that point to reurge

his complaint.   Having established that appellant's testimony was that all of the officer's

communications were part of a threat, defense counsel then could have asked the next question,

"What did the officer say to you?" or "What was the exact wording of the threat?"  Or defense

counsel could have simply asked the trial court to reconsider its ruling.  We will uphold a trial

court's decision to exclude evidence when that decision is correct at the time of its ruling, even if

later information shows that the evidence was admissible.[72]

Moreover, even if the trial court had been informed from the outset that the entire content

of the officer's statement was a threat, it is arguable that defense counsel still did not let the trial

court know that he wanted to introduce the exact wording of the alleged threat.  The question, "What

happened when you got back to Luxor?" did not necessarily require appellant to recite what a police

officer may have told him.  Defense counsel voiced no disagreement with the State's hearsay

objection or with the trial court's act of sustaining that objection.  Indeed, defense counsel

subsequently admonished appellant to relate what happened "[w]ithout saying what the officer told

you."

---

[71] *See* Tex. R. Evid. 801(d) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *United States v. Herrera*, 600 F.2d 502, 504 (5th Cir. 1979) (threatening statements were not offered for the truth of the matter asserted but for their effect on the person who received the threats).  It is clear from reading the appellate record that threat to which appellant was referring was the Spanish-officer incident related by appellant at the pretrial suppression hearing, which occurred two weeks before appellant's trial testimony.  We will assume, without deciding, that appellant's testimony at the pretrial hearing satisfied his burden to make an offer of proof regarding the content of the alleged threat.

[72] *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998); *see also Page*, 213 S.W.3d at 337 .

In *Reyna*, the defense attorney at least alerted the trial court to the fact that he wanted the evidence admitted with a reason given as to why it was admissible. In the present case, defense counsel never said that he thought the evidence was admissible, much less offered a reason for its admission. The trial court may have perceived that it was simply cutting off narrative testimony that had strayed beyond the intent of defense counsel's question into inadmissible territory.

Even if the colloquy were sufficient to preserve a complaint regarding the hearsay rule, it was not sufficient to preserve any constitutional complaints.[73] Assuming that the defense impliedly resisted the State's hearsay objection, the defense would have preserved only a complaint that the evidence was not hearsay.[74]

### B. Harm analysis

Because, at most, appellant preserved only a complaint that the evidence was not hearsay, the applicable harm standard is the one for non-constitutional errors: whether the error "affect[ed] substantial rights."[75] Under this standard, error is harmless if an appellate court has "fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but slight effect."[76]

We have already held that any error in admitting the confession would have been harmless, even under the standard for constitutional errors, because the evidence of appellant's guilt was overwhelming and the confession had no impact at punishment. At best appellant's excluded

---

[73] *See Reyna*, 168 S.W.3d at 179.

[74] *See id.*

[75] TEX. R. APP. P. 44.2(b).

[76] *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008).

evidence would have motivated the jury to discount the confession. Having already determined beyond a reasonable doubt that the exclusion of the confession would not have changed the jury's decisions on guilt and punishment, we likewise conclude that the jury's decision-making on those questions would not have changed if the confession were admitted but, based upon the excluded testimony, the jury chose to discount it.[77]

Moreover, appellant was able to introduce evidence that an officer threatened him. Presumably, had the trial court not sustained the State's objection, appellant would have also testified, consistent with his earlier pretrial hearing testimony, that the officer said, "You're lucky it wasn't me. I would have shot you in the mouth." But, had the jury heard this testimony, it might well have decided that the statement was not a threat at all. The statement had, at best, only a marginal tendency to prove the confession involuntary. Learning the content of the so-called threat would almost certainly have *weakened* the evidence in the eyes of the jury.

Further, the probativeness of this so-called threat evidence depended solely upon appellant's credibility, and the jury's verdict of guilt is an indication that it found appellant to be not credible. Had the jury believed appellant to be credible, it could have acquitted him on the basis of his testimony that he was not the shooter. Also, the record showed that the jury received a warnings

---

[77] Once one determines that the admission of the confession was harmless, it becomes conceptually difficult to fathom how appellant could have been harmed by the failure to admit evidence that had the sole relevance of rebutting the voluntariness of that confession. The harm analyses for the exclusion-of-evidence claim and the admission-of-confession claim cannot be cumulated: if the confession was inadmissible, then the rebuttal evidence appellant sought to introduce was also inadmissible, and we have already considered the state of the record in determining that the admission of the confession was harmless.

instruction under Article 38.22, §7.[78]  That instruction would have enabled the jury to disregard the confession if it believed appellant's testimony that he invoked his right to terminate the interview, but was ignored by the interrogating officers, or if it believed his other testimony that the confession was involuntary.[79]

Any error in excluding the testimony was harmless.  Points of error two and three are overruled.

## IV. JURY INSTRUCTIONS

In points of error four and five, appellant contends that he suffered egregious harm from the trial court's failure to submit certain voluntariness instructions on its own initiative.  Appellant contends that he should have received voluntariness instructions pursuant to Article 38.22, §6, and pursuant to Article 38.23(a).  Appellant concedes that he did not request these instructions at trial.

To be entitled to a voluntariness instruction under Article 38.22, §6, a defendant must have litigated a voluntariness issue before the trial judge (e.g. in a motion to suppress hearing), and the evidence, disputed or undisputed, must be such that a reasonable jury could find that the confession was involuntary.[80]  To be entitled to a voluntariness instruction under Article 38.23, a three-pronged test must be met: "(1) the evidence heard by the jury must raise an issue of fact; (2) the evidence on

---

[78]  This instruction included informing the jury that the officers must warn him of his right to remain silent and his right to terminate the interview, and it included an admonition that the jury must disregard the confession unless it determined "beyond a reasonable doubt that prior to and during such oral statement, if any, the defendant knowingly, intelligently, and voluntarily waived the rights hereinabove set out in the said warning."

[79]  We do not know for certain that the jury did not discount or disregard the confession.  If the jury did discount or disregard the confession, then any error would be harmless because the excluded evidence was relevant only to the voluntariness of that confession.

[80]  *Oursbourn v. State*, 259 S.W.3d 159, 175-76 (Tex. Crim. App. 2008).

that fact must be affirmatively contested; and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary."[81] We will assume, without deciding, that appellant has met the tests for submitting instructions pursuant to both of these statutes. Because he failed to request instructions under either of these provisions, the record must show egregious harm to establish reversible error.[82]

Egregious harm is a difficult standard to meet.[83] The record must show "actual, not just theoretical, harm to the accused,"[84] and the appellate court must be able to conclude that the defendant has been "deprived of a fair and impartial trial."[85] In determining whether the standard has been met, an appellate court must review "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."[86]

We have already held that any error in admitting appellant's confession would have been harmless beyond a reasonable doubt because the evidence of appellant's guilt was overwhelming. Having already held the admission of the confession to be harmless under a standard that is heavily slanted in appellant's favor, we can hardly hold the mere failure to give a jury instruction with

---

[81] *Id.* at 177.

[82] *Id.* at 174, 175-76, 182; *see also Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g).

[83] *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

[84] *Id.* at 489-90.

[85] *Id.* at 489.

[86] *Id.*

respect to that confession to be harmful under a standard that is heavily slanted against appellant. And the only evidence raising the voluntariness of the confession was appellant's own testimony, so the jury instructions would have helped appellant only if the jury found him to be credible. As we have already explained, the jury's verdict of guilt is an indication in this case that it found appellant to be not credible.

Moreover, even without the omitted instructions, the jury had several avenues through which it could have given effect to appellant's claims of involuntariness. First, if the jury believed that the confession was involuntary, it could have drawn the natural inference that an involuntary confession is an unreliable confession.[87] Second, the jury charge did contain an instruction that a statement of the accused may be used against him "if it appears that the same was freely and voluntarily made without compulsion or persuasion."[88] In his closing argument, defense counsel referred to that instruction to argue that the jury was required to disregard appellant's confession. Finally, pursuant to Article 38.22, §7, the jury was instructed to disregard the confession unless it determined "beyond a reasonable doubt that prior to and during" the confession, "the defendant knowingly, intelligently, and voluntarily waived" his rights, including his right to remain silent and his right to terminate the interview. If the jury believed that appellant's entire interaction with his interrogators was involuntary, then the §7 instruction would have required it to disregard the confession. For a finding of involuntariness to evade the §7 instruction, the jury would have had to believe both that appellant's decision to talk was voluntary and that the content of his confession was not. The

---

[87] Of course, it is possible to believe that a confession was involuntary but nevertheless reliable and true, but that possibility need not concern us in an egregious-harm analysis.

[88] *See* Art. 38.21.

evidence in this case was not conducive to simultaneously holding both of those beliefs. But even if it were, the jury still had the first two avenues for disregarding the confession, discussed above.

In his harm discussion, appellant also contends that the trial court erred in failing to include a complete description of the culpable mental state for capital murder of a peace officer. Appellant does not explain how a defective culpable-mental-state instruction impacts a harm analysis regarding the omission of voluntariness instructions, and its impact is not apparent to us. The issues seem to be entirely separate.

At any rate, the flaw in the culpable-mental-state instruction was so obviously harmless that it could not have impacted a harm analysis in connection with any other error. In a capital-murder prosecution involving the murder of a peace officer, a culpable mental state is required for both the result of the conduct (intentionally or knowingly killing a peace officer) and for circumstances surrounding the conduct (knowing that the victim was a peace officer).[89] The abstract portion of the jury charge defined the culpable mental state of "knowledge" only with respect to the result of conduct.[90] The definition should have contained language relating to circumstances surrounding the conduct.[91] But the application portion of the charge contained the appropriate "circumstances"

---

[89] TEX. PENAL CODE § 19.03(a)(1); *Hughes v. State*, 897 S.W.2d 285, 295 (Tex. Crim. App. 1994).

[90] The jury charge stated: "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."

[91] *See* TEX. PENAL CODE § 6.03(b) ("A person acts knowingly, or with knowledge, with respect . . . to circumstances surrounding his conduct when he is aware . . . that the circumstances exist.").

mental state: "knowing at the time that Timothy Abernethy was a peace officer."[92] And the evidence conclusively established that appellant knew that Abernethy was a peace officer. Officer Abernethy was in uniform and in his marked police car, with overhead lights flashing, when he pulled appellant over for a traffic stop. Further, Appellant conceded in his own testimony that he knew Abernethy was a police officer.

We conclude that appellant was not harmed by the absence of the jury instructions at issue. Points of error four and five are overruled.

## V. EFFECTIVE ASSISTANCE OF COUNSEL

In point of error six, appellant contends that he received ineffective assistance of counsel. To establish a claim of ineffective assistance, a defendant must show (1) that defense counsel's performance was deficient, and (2) that the defendant suffered prejudice.[93] To show deficient performance, a defendant must demonstrate "that counsel's representation fell below an objective standard of reasonableness."[94] Judicial scrutiny of counsel's performance is "highly deferential," and there is a "presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[95] To establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

---

[92] *See Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) ("Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious.")

[93] *Strickland v. Washington*, 466 U.S. 668, 687 (1980).

[94] *Id.* at 687-88.

[95] *Id.* at 689 (internal quotation marks omitted).

reasonable probability is a probability sufficient to undermine confidence in the outcome."[96]

## A. Deficient Performance

Appellant claims that counsel's performance was deficient in the following respects: (1) by not objecting to the absence of jury instructions on voluntariness under Article 38.22, §6, and Article 38.23, (2) by not objecting to the jury charge's definition of the culpable mental state of knowledge for failing to include language relating to "circumstances surrounding the conduct," (3) by not requesting a limiting instruction when the State impeached appellant with unrecorded statements he made during interrogation,[97] (4) by not objecting to guilt-phase evidence of the victim's good character, involving his accomplishments on the police force, including twenty-five commendations and two life-saving awards for saving the life of a ten-year-old girl and pulling a female suspect from a burning vehicle, (5) by failing to discuss certain testimony relating to voluntariness in his closing argument and by informing jurors that it was "impossible" for them to disregard appellant's confession, and (6) by not objecting to the instructions given under Article 38.22, §7, for failing to incorporate issues regarding whether appellant exercised his right to silence and his right to terminate the interview.

Appellant provides record references to each of the alleged failures, but he does not explain why counsel's performance fell below an objective standard of reasonableness. The "deficient performance" section of appellant's brief simply lists the allegedly deficient acts and omissions without elaboration. The defendant carries the burden of proving "by a preponderance of the

---

[96] *Id.* at 694.

[97] Unrecorded oral statements made while in custody are not admissible in the State's case-in-chief, but are admissible to impeach the defendant's credibility if he testifies. Art. 38.22, § 5.

evidence that trial counsel's performance was deficient" by showing that "counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms."[98] We also observe that no motion for new trial was filed and that trial counsel has not been given an opportunity to respond to appellant's allegations. Generally, "the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel."[99] We ordinarily require that counsel be afforded the opportunity to respond to a defendant's allegations before finding counsel deficient unless the challenged conduct is "so outrageous that no competent attorney would have engaged in it."[100] None of the above allegations outline conduct that is so outrageous as to establish deficient performance without giving counsel the opportunity to respond.

## B. Prejudice

Even if counsel's performance were deficient, appellant has not shown prejudice. We have already found the absence of various jury instructions (Article 38.22, §6, Article 38.23, and culpable mental state) to be harmless. Although the prejudice prong of *Strickland* and the harm standards discussed earlier are not the same, the reasons expressed above are sufficient for us to conclude that prejudice under *Strickland* has not been shown.

Regarding appellant's claim that counsel failed to request a limiting instruction on impeachment evidence, appellant does not specify what testimony in his eleven-page record citation is the subject of the complaint. The only testimony that seems to fit his description is appellant's testimony that he first told the police that he was not even at the scene of the crime that day.

---

[98] *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

[99] *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

[100] *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007).

Viewing that statement as substantive evidence would entail viewing it as evidence that appellant was not in fact at the scene—which would be helpful to appellant. The only value this evidence had for the State was its impeachment value—to show that appellant was not credible. Indeed, given the admitted falsity of the statement, we perceive no likelihood that the jury would view this testimony as substantive evidence.

With respect to the admission of evidence of the victim's good character, we observe that the complained-of testimony was relatively brief, taking up only five pages in the appellate record. This evidence did not impugn appellant's character and so had no tendency to inflame the jury into finding appellant guilty of a crime because he was a bad person. By generating sympathy for the victim, this may perhaps have been the kind of testimony that would have a tendency to influence a jury to reject a lesser-included offense on emotional grounds in favor of the charged offense. But no lesser-included offenses were submitted in this case, and none were raised by the evidence.[101] Moreover, this evidence was admissible at punishment.[102]

As for counsel's closing argument on the voluntariness question, we have no reason to believe that a different argument would have had any effect on the jury. Counsel did emphasize that the police department did not record the entire interrogation but recorded only a small portion of it. That argument was probably appellant's best chance to sway the jury toward believing that the confession was involuntary. We see no likelihood that the jury would have been impressed by counsel rehashing appellant's testimony. And counsel's acknowledgment that it was "impossible"

---

[101] *See Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993) ("[S]ome evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense.").

[102] *See Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998).

to disregard the confession was simply a prelude to his argument that the jury would have to consciously choose to disregard it. We do not see that acknowledgment as affecting the case one way or another. And in any event, the other evidence against appellant was so overwhelming that we are confident he would have been convicted even if the jury disregarded his confession.

Finally, with respect to appellant's complaint that his § 7 instructions should have been better, appellant contends that he was prejudiced because the instructions failed to "apply the law to appellant's testimony concerning his attempts to terminate the interview and remain silent." But appellant was not entitled under § 7 to instructions that applied the law to the facts.[103] Moreover, appellant received an instruction that required the jury to disregard the confession unless it determined "beyond a reasonable doubt that prior to and during" the confession, "the defendant knowingly, intelligently, and voluntarily waived" his rights, including his right to remain silent and his right to terminate the interview. This instruction enabled the jury to disregard the confession if, consistent with appellant's testimony, it believed that appellant did not voluntarily waive his right to terminate the interview. In any event, we again point out that we are confident, in light of the overwhelming evidence, that the jury would have convicted appellant even if it had disregarded his confession.

Point of error six is overruled.

The trial court's judgment is affirmed.

Delivered: June 29, 2011
Do not publish

---

[103] *Oursbourn v. State*, 259 S.W.3d 159, 173-74 (Tex. Crim. App. 2008) (Article 38.22, § 7 instructions are "general" not "specific" instructions that apply the law to the facts, unlike the instructions authorized by Article 38.23.).